UNITED STATES *v.* ARNOLD, SCHWINN
& CO. ET AL.

No. 25.   Argued April 20, 1967.—Decided June 12, 1967.

*Richard A. Posner* argued the cause for the United States. With him on the brief were *Solicitor General*

*Marshall, Assistant Attorney General Turner* and *Howard E. Shapiro.*

*Robert C. Keck* argued the cause for appellee Arnold, Schwinn & Co. With him on the brief were *Harold D. Burgess* and *James G. Hiering. Earl E. Pollock* argued the cause and filed a brief for appellee Schwinn Cycle Distributors Association.

MR. JUSTICE FORTAS delivered the opinion of the Court.

The United States brought this appeal to review the judgment of the District Court in a civil antitrust case alleging violations of § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1. Direct appeal is authorized by § 2 of the Expediting Act, 32 Stat. 823, as amended, 15 U. S. C. § 29. The complaint charged a continuing conspiracy since 1952 between defendants and other alleged co-conspirators involving price fixing, allocation of exclusive territories to wholesalers and jobbers, and confinement of merchandise to franchised dealers. Named as defendants were Arnold, Schwinn & Company ("Schwinn"), the Schwinn Cycle Distributors Association ("SCDA"), and B. F. Goodrich Company ("B. F. Goodrich").[1]

At trial, the United States asserted that not only the price fixing but also Schwinn's methods of distribution were illegal *per se* under § 1 of the Sherman Act. The trial lasted 70 days. The evidence, largely offered by appellees, elaborately sets forth information as to the total market interaction and interbrand competition, as well as the distribution program and practices.

The District Court rejected the charge of price fixing. With respect to the charges of illegal distribution practices, the court held that the territorial limitation was

---

[1] B. F. Goodrich negotiated a consent decree with the Government prior to trial, and dropped out of the case.

unlawful *per se* as respects products *sold* by Schwinn to its distributors; but that the limitation was not unlawful insofar as it was incident to sales by Schwinn itself to franchised retailers where the wholesaler or jobber (hereinafter referred to as the distributor) functioned as agent or consignee, including distribution pursuant to the "Schwinn Plan" described below.

The United States did not appeal from the District Court's rejection of its price-fixing charge. The appellees did not appeal from the findings and order invalidating restraints on resale by distributors who *purchase* products from Schwinn.

In this Court, the United States has abandoned its contention that the distribution limitations are illegal *per se*. Instead we are asked to consider these limitations in light of the "rule of reason," and, on the basis of the voluminous record below, to conclude that the limitations are the product of "agreement" between Schwinn and its wholesale and retail distributors and that they constitute an unreasonable restraint of trade.

Appellee Schwinn is a family-owned business which for many years has been engaged in the manufacture and sale of bicycles and some limited bicycle parts and accessories.[2] Appellee SCDA is an association of distributors handling Schwinn bicycles and other products. The challenged marketing program was instituted in 1952. In 1951 Schwinn had the largest single share of the United States bicycle market—22.5%. In 1961 Schwinn's share of market had fallen to 12.8% although its dollar and unit sales had risen substantially. In the same period, a competitor, Murray Ohio Manufacturing Company, which is now the leading United States bicycle

---

[2] Its parts and accessory business is less than 4% of its total sales. Like other bicycle producers, Schwinn manufactures the basic parts of its bicycles and purchases components from parts producers.

producer, increased its market share from 11.6% in 1951 to 22.8% in 1961. Murray sells primarily to Sears, Roebuck & Company and other mass merchandisers. By 1962 there were nine bicycle producers in the Nation, operating 11 plants. Imports of bicycles amounted to 29.7% of sales in 1961.

Forty percent of all bicycles are distributed by national concerns which operate their own stores and franchise others. Another 20% are sold by giant chains and mass merchandisers like Sears and Montgomery Ward & Company. Sears and Ward together account for 20% of all bicycle sales. Most of these bicycles are sold under private label. About 30% of all bicycles are distributed by cycle jobbers which specialize in the trade, and the remaining 10% by hardware and general stores.

Schwinn sells its products primarily to or through 22 wholesale distributors, with sales to the public being made by a large number of retailers. In addition, it sells about 11% of its total to B. F. Goodrich for resale in B. F. Goodrich retail or franchised stores. There are about 5,000 to 6,000 retail dealers in the United States which are bicycle specialty shops, generally also providing servicing. About 84% of Schwinn's sales are through such specialized dealers. Schwinn sells only under the Schwinn label, never under private label, while about 64% of all bicycles are sold under private label. Distributors and retailers handling Schwinn bicycles are not restricted to the handling of that brand. They may and ordinarily do sell a variety of brands.

The United States does not contend that there is in this case any restraint on interbrand competition, nor does it attempt to sustain its charge by reference to the market for bicycles as a whole. Instead, it invites us to confine our attention to the intrabrand effect of the contested restrictions. It urges us to declare that the

method of distribution of a single brand of bicycles, amounting to less than one-seventh of the market, constitutes an unreasonable restraint of trade or commerce among the several States.

Schwinn's principal methods of selling its bicycles are as follows: (1) sales to distributors, primarily cycle distributors, B. F. Goodrich and hardware jobbers; (2) sales to retailers by means of consignment or agency arrangements with distributors; and (3) sales to retailers under the so-called Schwinn Plan which involves direct shipment by Schwinn to the retailer with Schwinn invoicing the dealers, extending credit, and paying a commission to the distributor taking the order. Schwinn fair-traded certain of its models at retail in States permitting this, and suggested retail prices for all of its bicycles in all States. During the 1952–1962 period, as the District Court found, "well over half of the bicycles sold by Schwinn have been sold direct to the retail dealer (not to a cycle distributor) by means of Schwinn Plan sales and consignment and agency sales." Less than half were sold to distributors.[3]

After World War II, Schwinn had begun studying and revamping its distribution pattern. As of 1951–1952, it had reduced its mailing list from about 15,000 retail outlets to about 5,500. It instituted the practice of franchising approved retail outlets. The franchise did not prevent the retailer from handling other brands, but it did require the retailer to promote Schwinn bicycles and to give them at least equal prominence with competing brands. The number of franchised dealers in any area was limited, and a retailer was franchised only as to a designated location or locations. Each franchised dealer

[3] Schwinn's brief represents that presently about 75% of all Schwinn sales are now made under the Schwinn Plan; that there are no longer any consignment agreements; and that only two cycle distributors remain under agency contract.

was to purchase only from or through the distributor authorized to serve that particular area. He was authorized to sell only to consumers, and not to unfranchised retailers. The District Court found that while each Schwinn franchised retailer "knows that he is an unrestricted retail dealer, free to sell at his own price to any person who wants to buy on a retail basis. . . . [He] knows also that he is not a wholesaler and that he cannot sell as a wholesaler or act as an agent for some other unfranchised dealer, such as a discount house retailer . . . . When he acts as such an agent he subjects his franchise to cancellation at will by Schwinn."

Schwinn assigned specific territories to each of its 22 wholesale cycle distributors. These distributors were instructed to sell only to franchised Schwinn accounts and only in their respective territories which were specifically described and allocated on an exclusive basis. The District Court found "that certain cycle distributors have in fact not competed with each other . . . and that in so doing they have conspired with Schwinn to unreasonably restrain competition contrary to the provisions of Section 1 of the Sherman Act." The court, however, restricted this finding and its consequent order to transactions in which the distributor *purchased* the bicycles from Schwinn for resale, as distinguished from sales by the distributor as agent or consignee of Schwinn or on the Schwinn Plan. The United States urges that this Court should require revision of the decree in this respect to forbid territorial exclusivity regardless of the technical form by which the products are transferred from Schwinn to the retailer or consumer.[4]

---

[4] The United States did not perfect this point below, and its Jurisdictional Statement in this Court did not expressly request revision of the decree. Appellees strenuously urge that we should for these reasons refuse to consider the United States' present argument that the decree should be enlarged as stated. See Supreme

The District Court rejected the Government's contention that Schwinn had in fact canceled the franchises of some retailers because of sales to discount houses or other unfranchised dealers, nor did it find that distributors have been cut off because of sales to unfranchised retailers or violation of territorial limitations. The United States urges that this is "clearly erroneous." In any event, it is clear and entirely consistent with the District Court's findings that Schwinn has been "firm and resolute" in insisting upon observance of territorial and customer limitations by its bicycle distributors and upon confining sales by franchised retailers to consumers, and that Schwinn's "firmness" in these respects was grounded upon the communicated danger of termination. Our analysis will embrace this conclusion, rather than the finding which is urged by the Government and which was refused by the trial court that Schwinn actually terminated retail franchises or cut off distributors for the suggested reasons.

We come, then, to the legal issues in this case. We are here confronted with challenged vertical restrictions as to territory and dealers. The source of the restrictions is the manufacturer. These are not horizontal restraints, in which the actors are distributors with or without the manufacturer's participation. We have held in such a case, where the purpose was to prevent the distribution of automobiles to or by "discounters," that a "classic conspiracy in restraint of trade" results.

---

Court Rules 15 (1) (c) (1) and 40 (1) (d) (2); *General Pictures Co. v. Electric Co.*, 304 U. S. 175, 177–179 (1938). While we regard with disfavor the Government's practice in this case, both with respect to the point here at issue and its change of theory, in view of the nature and importance of the case, we shall not reject the tendered issues because the request for the substance of the relief was embraced in the question presented in the Jurisdictional Statement and because appellees have not been adversely affected.

*United States* v. *General Motors Corp.*, 384 U. S. 127 (1966); see also *Klor's, Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U. S. 207 (1959); *Timken Roller Bearing Co.* v. *United States*, 341 U. S. 593 (1951). Nor is this a case of territorial or dealer restrictions accompanied by price fixing, for here the issue of unlawful price fixing was tendered, litigated, decided against the appellant, and appellant has not appealed. If it were otherwise— if there were here a finding that the restrictions were part of a scheme involving unlawful price fixing, the result would be a *per se* violation of the Sherman Act. *United States* v. *Sealy, Inc., ante,* p. 350; *United States* v. *Bausch & Lomb Co.*, 321 U. S. 707, 724 (1944). Because of the posture of the case and the failure of the Government to urge the point, we do not here pause to consider whether a case might be presented, short of unlawful price fixing, in which the activities of the manufacturer to affect resale prices—whether styled price "maintenance" or "stabilization" or otherwise—would fatally infect vertical customer restrictions so as to require a conclusion of *per se* violation. The Government does not contend that a *per se* violation of the Sherman Act is presented by the practices which are involved in this appeal (that is, without reference to the practice which the lower court enjoined and which is not before us). Accordingly, we are remitted to an appraisal of the market impact of these practices.

In *White Motor Co.* v. *United States*, 372 U. S. 253 (1963), this Court refused to affirm summary judgment against the manufacturer even though there were not only vertical restrictions as to territory and customer selection but also unlawful price fixing. The Court held that there was no showing that the price fixing was "an integral part of the whole distribution system" and accordingly it declined to outlaw the system because of the possibility that a trial laying bare "the economic

374

and business stuff out of which these arrangements emerge" might demonstrate their reasonableness. *Id.,* at 263. So here we must look to the specifics of the challenged practices and their impact upon the marketplace in order to make a judgment as to whether the restraint is or is not "reasonable" in the special sense in which § 1 of the Sherman Act must be read for purposes of this type of inquiry. *Chicago Board of Trade* v. *United States,* 246 U. S. 231, 238 (1918); *Standard Oil Co.* v. *United States,* 221 U. S. 1, 51 (1911); *Apex Hosiery* v. *Leader,* 310 U. S. 469, 498 (1940).[5]

We first observe that the facts of this case do not come within the specific illustrations which the Court in *White Motor* articulated as possible factors relevant to a showing that the challenged vertical restraint is sheltered by the rule of reason because it is not anticompetitive. Schwinn was not a newcomer, seeking to break into or stay in the bicycle business. It was not a "failing company." On the contrary, at the initiation of these practices, it was the leading bicycle producer in the Nation. Schwinn contends, however, and the trial court found, that the reasons which induced it to adopt the challenged distribution program were to enable it and the small, independent merchants that made up its chain of distribution to compete more effectively in the marketplace. Schwinn

---

[5] The United States, having abandoned its contention that the restraints in the present case are *per se* violations of the Sherman Act, now urges "a standard of presumptive illegality," presumably on the basis of a showing that a product has been distributed by means of arrangements for territorial exclusivity and restricted retail and wholesale customers. We do not consider this additional subtlety which was not advanced in the trial court. The burden of proof in antitrust cases remains with the plaintiff, deriving such help as may be available in the circumstances from particularized rules articulated by law—such as the *per se* doctrine. Cf. *Standard Oil Co.* v. *United States,* 283 U. S. 163, 179 (1931).

sought a better way of distributing its product: a method which would promote sales, increase stability of its distributor and dealer outlets, and augment profits. But this argument, appealing as it is, is not enough to avoid the Sherman Act proscription; because, in a sense, every restrictive practice is designed to augment the profit and competitive position of its participants. Price fixing does so, for example, and so may a well-calculated division of territories. See *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150 (1940). The antitrust outcome does not turn merely on the presence of sound business reason or motive. Here, for example, if the test of reasonableness were merely whether Schwinn's restrictive distribution program and practices were adopted "for good business reasons" and not merely to injure competitors, or if the answer turned upon whether it was indeed "good business practice," we should not quarrel with Schwinn's eloquent submission or the finding of the trial court. But our inquiry cannot stop at that point. Our inquiry is whether, assuming nonpredatory motives and business purposes and the incentive of profit and volume considerations, the effect upon competition in the marketplace is substantially adverse. The promotion of self-interest alone does not invoke the rule of reason to immunize otherwise illegal conduct. It is only if the conduct is not unlawful in its impact in the marketplace or if the self-interest coincides with the statutory concern with the preservation and promotion of competition that protection is achieved. *Chicago Board of Trade, supra,* at 238.

On this basis, restraints as to territory or customers, vertical or horizontal, are unlawful if they are "ancillary to the price-fixing" (*White Motor Co.* v. *United States, supra,* at 260) or if the price fixing is "an integral part of the whole distribution system." (*Bausch & Lomb, supra,* at 720.) In those situations, it is needless to inquire fur-

ther into competitive effect because it is established doctrine that, unless permitted by statute, the fixing of prices at which others may sell is anticompetitive, and the unlawfulness of the price fixing infects the distribution restrictions. Cf. *Sealy, supra,* and *Bausch & Lomb, supra.* At the other extreme, a manufacturer of a product other and equivalent brands of which are readily available in the market may select his customers, and for this purpose he may "franchise" certain dealers to whom, alone, he will sell his goods. Cf. *United States* v. *Colgate & Co.,* 250 U. S. 300 (1919). If the restraint stops at that point—if nothing more is involved than vertical "confinement" of the manufacturer's own sales of the merchandise to selected dealers, and if competitive products are readily available to others, the restriction, on these facts alone, would not violate the Sherman Act. It is within these boundary lines that we must analyze the present case.

The District Court here enjoined appellees from limiting the territory within which any wholesaler or jobber may sell any Schwinn product which it has purchased. It held that these are agreements to divide territory and, as such, are *per se* violations of § 1 of the Sherman Act. The court made clear that it confined its order to transactions in which the distributor *purchases* from Schwinn. As to consignment, agency and Schwinn Plan transactions, the court held that, in these instances, "Schwinn has a right to allocate its agents or salesmen to a particular territory." The court also held that the franchising of retailers was reasonable in view of the competitive problem presented by "giant" bicycle retailers such as Sears and Ward and by other mass merchandisers, and it declined to enjoin appellees' practices with respect to confinement of sale by distributors or Schwinn to franchised retailers, or to forbid Schwinn and its distributors from continuing to prohibit franchised retailers

from selling to discount houses or other unfranchised retailers for resale to the public.

As noted above, appellees have not appealed from the District Court's order, and, accordingly, we have before us only the Government's pleas: (1) that the decree should not be confined to *sale* transactions between Schwinn and wholesalers but should reach territorial restrictions upon distributors whether they are incident to sale and resale transactions or to consignment, agency or Schwinn-Plan relationship between Schwinn and the distributors; (2) that agreements requiring distributors to limit their distribution to only such retailers as are franchised should be enjoined; and (3) that arrangements preventing franchised retailers from supplying non-franchised retailers, including discount stores, should also be forbidden.

As to point (2), the Government argues that it is illogical and inconsistent to forbid territorial limitations on resales by distributors where the distributor owns the goods, having bought them from Schwinn, and, at the same time, to exonerate arrangements which require distributors to confine resales of the goods they have bought to "franchised" retailers. It argues that requiring distributors, once they have purchased the product, to confine sales to franchised retailers is indistinguishable in law and principle from the division of territory which the decree condemns. Both, the Government argues, are in the nature of restraints upon alienation which are beyond the power of the manufacturer to impose upon its vendees and which, since the nature of the transaction includes an agreement, combination or understanding, are violations of § 1 of the Sherman Act. Cf. *Dr. Miles Medical Co.* v. *Park & Sons Co.,* 220 U. S. 373 (1911); *United States* v. *Bausch & Lomb Co., supra; Klor's, Inc.* v. *Broadway-Hale Stores, Inc., supra; Fash-*

*ion Originators' Guild* v. *FTC,* 312 U. S. 457 (1941); *United States* v. *General Motors Corp.,* 384 U. S. 127 (1966). We agree, and upon remand, the decree should be revised to enjoin any limitation upon the freedom of distributors to dispose of the Schwinn products, which they have bought from Schwinn, where and to whomever they choose. The principle is, of course, equally applicable to sales to retailers, and the decree should similarly enjoin the making of any sales to retailers upon any condition, agreement or understanding limiting the retailer's freedom as to where and to whom it will resell the products.

The appellant vigorously argues that, since this remedy is confined to situations where the distributor and retailer acquire title to the bicycles, it will provide only partial relief; that to prevent the allocation of territories and confinement to franchised retail dealers, the decree can and should be enlarged to forbid these practices, however effected—whether by sale and resale or by agency, consignment, or the Schwinn Plan. But we are dealing here with a vertical restraint embodying the unilateral program of a single manufacturer. We are not dealing with a combination of manufacturers, as in *Klor's,* or of distributors, as in *General Motors.* We are not dealing with a "division" of territory in the sense of an allocation by and among the distributors, see *Sealy, supra,* or an agreement among distributors to restrict their competition, see *General Motors, supra.* We are here concerned with a truly vertical arrangement, raising the fundamental question of the degree to which a manufacturer may not only select the customers to whom he will sell, but also allocate territories for resale and confine access to his product to selected, or franchised, retailers. We conclude that the proper application of § 1 of the Sherman Act to this problem requires differentiation between the situation where the manu-

facturer parts with title, dominion, or risk with respect to the article, and where he completely retains ownership and risk of loss.

As the District Court held, where a manufacturer *sells* products to his distributor subject to territorial restrictions upon resale, a *per se* violation of the Sherman Act results. And, as we have held, the same principle applies to restrictions of outlets with which the distributors may deal and to restraints upon retailers to whom the goods are sold. Under the Sherman Act, it is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it. *White Motor, supra; Dr. Miles, supra.* Such restraints are so obviously destructive of competition that their mere existence is enough. If the manufacturer parts with dominion over his product or transfers risk of loss to another, he may not reserve control over its destiny or the conditions of its resale.[6] To permit this would sanction franchising and confinement of distribution as the ordinary instead of the unusual method which may be permissible in an appropriate and impelling competitive setting, since most merchandise is distributed by means of purchase and sale. On the other hand, as indicated in *White Motor,* we are not prepared to introduce the inflexibility which a *per se* rule might bring if it were applied to prohibit all vertical restrictions of territory and all franchising, in the sense of designating specified distributors and retailers as the chosen instruments through which the manufacturer, re-

---

[6] We have no occasion here to consider whether a patentee has any greater rights in this respect. Compare *United States* v. *General Electric Co.,* 272 U. S. 476 (1926), with *United States* v. *New Wrinkle, Inc.,* 342 U. S. 371 (1952); *United States* v. *Line Material Co.,* 333 U. S. 287 (1948); and *United States* v. *Masonite Corp.,* 316 U. S. 265 (1942).

taining ownership of the goods, will distribute them to the public. Such a rule might severely hamper smaller enterprises resorting to reasonable methods of meeting the competition of giants and of merchandising through independent dealers, and it might sharply accelerate the trend towards vertical integration of the distribution process. But to allow this freedom where the manufacturer has parted with dominion over the goods—the usual marketing situation—would violate the ancient rule against restraints on alienation and open the door to exclusivity of outlets and limitation of territory further than prudence permits.

The Government does not here contend for a *per se* rule as to agency, consignment, or Schwinn-Plan transactions even though these may be used—as they are here—to implement a scheme of confining distribution outlets as in this case. Where the manufacturer retains title, dominion, and risk with respect to the product and the position and function of the dealer in question are, in fact, indistinguishable from those of an agent or salesman of the manufacturer, it is only if the impact of the confinement is "unreasonably" restrictive of competition that a violation of § 1 results from such confinement, unencumbered by culpable price fixing. *Simpson* v. *Union Oil Co.*, 377 U. S. 13 (1964). As the District Court found, Schwinn adopted the challenged distribution programs in a competitive situation dominated by mass merchandisers which command access to large-scale advertising and promotion, choice of retail outlets, both owned and franchised, and adequate sources of supply. It is not claimed that Schwinn's practices or other circumstances resulted in an inadequate competitive situation with respect to the bicycle market; and there is nothing in this record—after elimination of the price-fixing issue—to lead us to conclude that Schwinn's program exceeded the limits reasonably necessary to meet

the competitive problems posed by its more powerful competitors. In these circumstances, the rule of reason is satisfied.

We do not suggest that the unilateral adoption by a single manufacturer of an agency or consignment pattern and the Schwinn type of restrictive distribution system would be justified in any and all circumstances by the presence of the competition of mass merchandisers and by the demonstrated need of the franchise system to meet that competition. But certainly, in such circumstances, the vertically imposed distribution restraints—*absent* price fixing and in the presence of adequate sources of alternative products to meet the needs of the unfranchised—may not be held to be *per se* violations of the Sherman Act. The Government, in this Court, so concedes in this case.

On this record, we cannot brand the District Court's finding as clearly erroneous and cannot ourselves conclude that Schwinn's franchising of retailers and its confinement of retail sales to them—so long as it retains all indicia of ownership, including title, dominion, and risk, and so long as the dealers in question are indistinguishable in function from agents or salesmen—constitute an "unreasonable" restraint of trade. Critical in this respect are the facts: (1) that other competitive bicycles are available to distributors and retailers in the marketplace, and there is no showing that they are not in all respects reasonably interchangeable as articles of competitive commerce with the Schwinn product;[7] (2) that Schwinn distributors and retailers handle other brands of bicycles as well as Schwinn's; (3) in the present posture of the case we cannot rule that the vertical restraints are unreasonable because of their intermixture with price fixing; and (4) we cannot disagree with the findings of

[7] We do not regard Schwinn's claim of product excellence as establishing the contrary.

the trial court that competition made necessary the challenged program; that it was justified by, and went no further than required by, competitive pressures; and that its net effect is to preserve and not to damage competition in the bicycle market. Application of the rule of reason here cannot be confined to intrabrand competition. When we look to the product market as a whole, we cannot conclude that Schwinn's franchise system with respect to products as to which it retains ownership and risk constitutes an unreasonable restraint of trade. This does not, of course, excuse or condone the *per se* violations which, in substance, consist of the control over the resale of Schwinn's products after Schwinn has parted with ownership thereof. Once the manufacturer has parted with title and risk, he has parted with dominion over the product, and his effort thereafter to restrict territory or persons to whom the product may be transferred—whether by explicit agreement or by silent combination or understanding with his vendee—is a *per se* violation of § 1 of the Sherman Act.

Accordingly, the judgment of the District Court is reversed and the cause remanded for the entry of a decree in accordance with this opinion.

*It is so ordered.*

MR. JUSTICE CLARK and MR. JUSTICE WHITE took no part in the decision of this case.

MR. JUSTICE STEWART, whom MR. JUSTICE HARLAN joins, concurring in part and dissenting in part.

I agree with the Court's basic determination that Schwinn's marketing system is, under the rule of reason, entirely consonant with the antitrust laws. But I cannot understand how that marketing system becomes *per se* unreasonable and illegal in those instances where it is effectuated through sales to wholesalers and dealers.

Schwinn's present marketing policies were developed in the late 1940's and early 1950's. Studies undertaken at that time revealed that Schwinn's existing distribution activities were haphazard and inefficient, involving a large number of wholesalers and over 15,000 retailers of every size and variety. Many of the retailers were largely or completely inactive, resulting in unprofitable overhead costs and wasted advertising and promotional expenditures for Schwinn. Moreover, the sales methods and service resources of many of these outlets did not comport with Schwinn's traditional policy of manufacturing and selling quality bicycles. Schwinn believed that proper promotion of its products required an active and stable dealer organization, composed of experienced people who could properly promote, assemble and service bicycles. Such dealers were to be found primarily in small independent bicycle sales and repair shops, rather than hardware stores or mass merchandisers that sold bicycles unassembled in the carton and provided no service and repair facilities.[1] As the District Court found, "Schwinn determined that it did not want Tom, Dick and Harry to be selling its product in a carton, collecting the price paid, 'kissing the customer goodbye,' depositing his profit and forgetting the customer, Schwinn, and the public generally."[2]

Schwinn accordingly developed a franchising policy that would assure quality and efficiency in its distribution system. After consulting with marketing experts in government and industry and clearing its program with the Federal Trade Commission, it franchised about 5,500

[1] The District Court found that: "Bicycles are in constant need of service. Hardware stores, department stores, and most other sales outlets do not furnish these services. Retail cycle outlets do. That is the type of business establishment that Schwinn has turned to as their local sales representatives." 237 F. Supp. 323, 335.

[2] 237 F. Supp., at 338.

selected retailers to market its products. "Schwinn chose those who by their record were best credit risks, made the most sales, and provided the best service for Schwinn bicycles." [3] These retailers were predominantly the small independent bicycle sales and repair dealers mentioned above, who now represent nearly all of Schwinn's outlets.

By forming this relationship with independent dealers, Schwinn hoped to meet the competition of the giant chain distributors. These distributors account for 60% of retail bicycle sales. Although the past decade and a half has been one of unprecedented vigorous competition in the industry, spurred by a flood of imported bicycles, Schwinn's policy has in large part succeeded. While profits and margins have been squeezed,[4] Schwinn's sales have increased substantially, it has pared the number of inactive retailers and increased the number of high-volume dealers, and it has reaped a greater return from its advertising and promotional expenditures. As the District Court concluded: [5]

> "The evidence is abundantly clear that Schwinn's practice of eliminating dead timber, useless and inactive or relatively inactive accounts, and persons and firms unable or unwilling to provide service and part replacements, and adopting and adhering to a franchise program instead of restraining trade in Schwinn bicycles, has greatly enhanced trade in Schwinn bicycles and has in fact been the salvation of Schwinn . . . and has actually made for genuine competition in the bicycle manufacturing industry."

Of course, the whole premise of Schwinn's marketing program was that its product would be sold to the public

---

[3] *Ibid.*

[4] In the 1951–1961 period, Schwinn's prices fell between 9% and 12%, and its profits also declined. The margins of its wholesalers and retailers were reduced about 10% during the same period.

[5] 237 F. Supp., at 338.

only by the qualified retailers whom it had franchised.[6] Accordingly, Schwinn unilaterally instituted a policy of ensuring that only franchised retailers would be supplied with its products. This policy was the same, whether distribution took the form of the so-called Schwinn Plan deliveries to retailers, or agency and consignment arrangements, or whether it took the form of sales by Schwinn to wholesalers and resale by them to retailers. The record shows that this policy was implemented largely through request and persuasion by Schwinn.

Schwinn's selective distribution policy may be said to embody restraints on trade. As such, it is subject to antitrust scrutiny, but the scrutiny does not stop with the label "restraint." The words written by Mr. Justice Brandeis for a unanimous Court in *Chicago Board of Trade* v. *United States*, 246 U. S. 231, 238, bear repeating:

> "Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts."

In *White Motor Co.* v. *United States*, 372 U. S. 253, we reaffirmed this formulation of the rule of reason and

---

[6] This premise is common to all forms of franchising. See Lewis & Hancock, The Franchise System of Distribution 4, 9 (1963).

refused to adopt *per se* rules to invalidate vertical restraints on distribution analogous to but more restrictive than those involved here. The District Court in this case explicitly followed the directive of *White Motor* and examined in detail the historical and economic context in which Schwinn's distribution policies were developed and applied. The evidence fully supports the District Court's findings that the ultimate effect of these policies was to enhance rather than undermine or destroy competition, and I fully join the Court's approval of those findings today.

It is worth emphasizing that the justifications for Schwinn's franchising policy rest not only on the facts of this particular record, but on larger issues of social and economic policy. This Court has recognized Congress' concern with the disappearance of the small independent merchant in the face of competition from vertically integrated giants. See *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 333, 346. This trend in many cases reflects the inexorable economic realities of modern marketing. But franchising promises to provide the independent merchant with the means to become an efficient and effective competitor of large integrated firms. Through various forms of franchising, the manufacturer is assured qualified and effective outlets for his products, and the franchisee enjoys backing in the form of know-how and financial assistance.[7] These franchise arrangements also make significant social and economic contributions of importance to the whole society, as at least one federal court has noted:

> "The franchise method of operation has the advantage, from the standpoint of our American sys-

---

[7] See Lewis & Hancock, The Franchise System of Distribution (1963); Small Business Administration, Management Aids for Small Manufacturers, No. 182, "Expanding Sales Through Franchising" (1966).

tem of competitive economy, of enabling numerous groups of individuals with small capital to become entrepreneurs. . . . If our economy had not developed that system of operation these individuals would have turned out to have been merely employees. The franchise system creates a class of independent businessmen; it provides the public with an opportunity to get a uniform product at numerous points of sale from small independent contractors, rather than from employees of a vast chain." [8]

Indiscriminate invalidation of franchising arrangements would eliminate their creative contributions to competition and force "suppliers to abandon franchising and integrate forward to the detriment of small business. In other words, we may inadvertently compel concentration" by misguided zealousness.[9]  As a result, "[t]here [would be] less and less place for the independent." *Standard Oil Co.* v. *United States,* 337 U. S. 293, 315 (separate opinion of MR. JUSTICE DOUGLAS). "The small, independent business man [would] be supplanted by clerks." *Id.,* at 321.

For these reasons I completely agree with the Court's basic approach to this case. The Court fully recognizes

---

[8] *Susser* v. *Carvel Corp.,* 206 F. Supp. 636, 640, aff'd, 332 F. 2d 505, cert. granted, 379 U. S. 885, cert. dismissed, 381 U. S. 125. See also Distribution Problems Affecting Small Business, Hearings before the Subcommittee on Antitrust and Monopoly, Senate Committee on the Judiciary, 89th Cong., 1st Sess., 7–9, 12–13 (statement of Small Business Administration Administrator Eugene P. Foley), 90 (statement of Federal Trade Commission Chairman Paul Rand Dixon) (March 1965); Lewis & Hancock, The Franchise System of Distribution 91–92 (1963); Handler, Statement Before the Small Business Administration, 11 Antitrust Bull. 417, 419.

[9] Wilson, Some Problems Relative to Franchise Arrangements, 11 Antitrust Bull. 473, 488. It should be noted that since the start of this litigation, Schwinn has taken over 30% of the wholesaling of its products by vertical integration.

that outlawry of franchising "might severely hamper smaller enterprises resorting to reasonable methods of meeting the competition of giants and of merchandising through independent dealers, and it might sharply accelerate the trend towards vertical integration of the distribution process." It acknowledges that Schwinn's marketing program has operated "to preserve and not to damage competition," and concludes that "the rule of reason" is satisfied. It upholds the legality of the Schwinn Plan, which is the heart of Schwinn's marketing system, now accounting for 75% of the distribution of Schwinn's products. It also upholds the legality of Schwinn's agency and consignment arrangements.

But the Court inexplicably turns its back on the values of competition by independent merchants and the flexible wisdom of the rule of reason when dealing with distribution effected through sales to wholesalers. In Schwinn's particular marketing system, this mode of distribution plays a subsidiary role, serving to meet "fill-in" orders by dealers, whose basic stock is obtained through the Schwinn Plan. Without considering its function, purpose or effect, the Court declares this aspect of Schwinn's program to be *per se* invalid. It likewise applies the same automatic rule of illegality to strike down Schwinn's policy of ensuring that franchised dealers do not resell to unfranchised retailers and thus subvert the whole distributional scheme.

Despite the Government's concession that the rule of reason applies to all aspects of Schwinn's distribution system, the Court nevertheless reaches out to adopt a potent *per se* rule. No previous antitrust decision of this Court justifies its action.[10] Instead, it completely

---

[10] The Court cites *Dr. Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 373, but that case was decided on common-law principles and involved price-fixing, long recognized by this Court as *per se* invalid.

repudiates the only case in point, *White Motor*. There the manufacturer sold its products to retailers and wholesalers and imposed territorial and customer restrictions on their resale, restrictions much more stringent than those involved here. But the Court in *White Motor* refused to apply a *per se* rule to invalidate these restrictions, and declared that their legality must be tested under the rule of reason by examining their actual impact in a particular competitive context. The Court today is unable to give any reasons why, only four years later, this precedent should be overruled. Surely, we have not in this short interim accumulated sufficient new experience or insight to justify embracing a rule automatically invalidating any vertical restraints in a distribution system based on sales to wholesalers and retailers. See 372 U. S., at 264–266 (concurring opinion of MR. JUSTICE BRENNAN). Indeed, the Court does not cite or discuss any new data that might support such a radical change in the law. And I am completely at a loss to fathom how the Court can adopt its *per se* rule concerning distributional sales and yet uphold identical restrictions in Schwinn's marketing scheme when distribution takes the form of consignment or Schwinn Plan deliveries. It does not demonstrate that these restrictions are in their actual operation somehow more anticompetitive or less justifiable merely because the contractual relations between Schwinn and its jobbers and dealers bear the label "sale" rather than "agency" or "consignment." Such irrelevant formulae are false guides to sound adjudication in the antitrust field: "Our choice must be made on the basis not of abstractions but of the realities of modern industrial life." *Standard Oil Co.* v. *United States,* 337 U. S. 293, 320 (separate opinion of MR. JUSTICE DOUGLAS).

The Court advances two justifications for its new *per se* rule. I do not find either persuasive. First, the

Court correctly observes that the District Court invalidated territorial limitations on the resale activities of Schwinn's wholesalers. The Court then states that it would be "illogical and inconsistent" not to strike down all the other restrictions in Schwinn's marketing program insofar as sales are involved. But the Court completely overlooks the fact that the territorial limitations invalidated by the District Court were the product of a horizontal conspiracy between the wholesalers. The District Court found a "division of territory by agreement between the distributors . . . horizontal in nature." [11] Schwinn played a part in this conspiracy, but just as in *United States* v. *General Motors Corp.,* 384 U. S. 127, 140, that did not alter its fundamentally horizontal nature as a "classic conspiracy in restraint of trade." In striking down this horizontal division of markets between competing distributors, the District Court was simply following familiar precedent. *Timken Roller Bearing Co.* v. *United States,* 341 U. S. 593. By contrast, the restrictions involved in the franchising methods now before us are quite different in nature, as the Court points out elsewhere in its opinion:

> "[W]e are dealing here with a vertical restraint embodying the unilateral program of a single manufacturer. We are not dealing with a combination . . . of distributors, as in *General Motors*. We are not dealing with a 'division' of territory in the sense of an allocation by and among the distributors . . . or an agreement among distributors to restrict their competition, see *General Motors, supra*. We are here concerned with a truly vertical arrangement." *Ante,* at 378.

As the Court also emphasizes, the legal principles applicable to horizontal and vertical restrictions are quite

---

[11] 237 F. Supp., at 342.

different.[12]  Thus, applying the rule of reason to the vertical restraints now in issue is not at all "illogical and inconsistent" with *per se* invalidation of the wholesalers' horizontal division of markets.

The Court's second justification for its new *per se* doctrine is the "ancient rule against restraints on alienation." This rule of property law is certainly ancient—it traces its lineage to Coke on Littleton.[13]  But it is hardly the practice of this Court to embrace a rule of law merely on grounds of its antiquity.  Moreover, the common-law doctrine of restraints on alienation is not nearly so rigid as the Court implies.  The original rule concerned itself with arbitrary and severe restrictions on alienation, such as total prohibition of resale.[14]  As early as 1711 it was recognized that only *unreasonable* restraints should be proscribed, and that partial restrictions could be justified when ancillary to a legitimate business purpose and not

---

[12] One difference between a horizontal conspiracy and vertical restraints imposed by the manufacturer is that there is often serious question whether the latter conduct involves the "contract, combination . . . or conspiracy" required by § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1.  The District Judge in this case refused to find that the relevant conduct of Schwinn and its distributors amounted to a "contract," "combination" or "conspiracy." Instead, he stated that "the Schwinn franchising program was conceived, hatched and born into life . . . in the minds of the Schwinn officials," and agreed that "the action was unilateral in nature." Although essential to its case, the Government failed specifically to raise this issue in its Jurisdictional Statement, and I must register my disagreement with the Court's cursory treatment of the matter. The Court merely notes that "Schwinn has been 'firm and resolute' in insisting upon observance" of the restrictions involved in its franchising program and that there was a "communicated danger of termination" for violations of its policies.  This alone does not amount to a "contract," "combination" or "conspiracy" under established precedent.  *United States* v. *Colgate & Co.,* 250 U. S. 300; *United States* v. *Parke, Davis & Co.,* 362 U. S. 29.

[13] 2 Coke, Institutes of the Laws of England § 360 (Day ed. 1812).

[14] *Ibid.*

unduly anticompetitive in effect. *Mitchel* v. *Reynolds,* 1 P. Wms. 181, 24 Eng. Rep. 347. Cf. *Tulk* v. *Moxhay,* 2 Ph. 774, 41 Eng. Rep. 1143. This doctrine of ancillary restraints was assimilated into the jurisprudence of this country in the nineteenth century. See *Oregon Steam Navigation Co.* v. *Winsor,* 20 Wall. 64; *United States* v. *Addyston Pipe & Steel Co.,* 85 F. 271.

Centuries ago, it could perhaps be assumed that a manufacturer had no legitimate interest in what happened to his products once he had sold them to a middleman and they had started their way down the channel of distribution. But this assumption no longer holds true in a day of sophisticated marketing policies, mass advertising, and vertically integrated manufacturer-distributors.[15] Restrictions like those involved in a franchising program should accordingly be able to claim justification under the ancillary restraints doctrine.

In any event, the state of the common law 400 or even 100 years ago is irrelevant to the issue before us: the effect of the antitrust laws upon vertical distributional restraints in the American economy today. The problems involved are difficult and complex,[16] and our response should be more reasoned and sensitive than the simple acceptance of a hoary formula. "It does seem possible that the nineteenth and twentieth centuries have contributed legal conceptions growing out of new types of

---

[15] See Elman, "Petrified Opinions" and Competitive Realities, 66 Col. L. Rev. 625.

[16] See Jordan, Exclusive and Restricted Sales Areas Under the Antitrust Laws, 9 U. C. L. A. L. Rev. 111; McLaren, Territorial Restrictions, Exclusive Dealing, and Related Sales Distribution Problems Under the Antitrust Laws, 11 Prac. Law. No. 4, 79; Preston, Restrictive Distribution Arrangements: Economic Analysis and Public Policy Standards, 30 Law & Contemp. Prob. 506; Robinson, Restraints on Trade and the Orderly Marketing of Goods, 45 Cornell L. Q. 254; Note, Restricted Channels of Distribution Under the Sherman Act, 75 Harv. L. Rev. 795.

business which make it inappropriate" for the Court to base its "overthrow of contemporary commercial policies on judicial views of the reign of Queen Elizabeth." [17] Moreover, the Court's answer makes everything turn on whether the arrangement between a manufacturer and his distributor is denominated a "sale" or "agency." Such a rule ignores and conceals the "economic and business stuff out of which" a sound answer should be fashioned. *White Motor Co.* v. *United States, supra,* at 263. The Court has emphasized in the past that these differences in form often do not represent "differences in substance." *Simpson* v. *Union Oil Co.,* 377 U. S. 13, 22. Draftsmen may cast business arrangements in different legal molds for purposes of commercial law, but these arrangements may operate identically in terms of economic function and competitive effect. It is the latter factors which are the concern of the antitrust laws. The record does not show that the purposes of Schwinn's franchising program and the competitive consequences of its implementation differed, depending on whether Schwinn sold its products to wholesalers or resorted to the agency, consignment, or Schwinn Plan methods of distribution. And there is no reason generally to suppose that variations in the formal legal packaging of franchising programs produce differences in their actual impact in the marketplace. Our experience is to the contrary. As stated in *United States* v. *Masonite Corp.,* 316 U. S. 265, 278, 280:

> "[T]his Court has quite consistently refused to allow the form into which the parties chose to cast the transaction to govern.
>
> .        .        .        .        .
>
> "So far as the Sherman Act is concerned, the result must turn not on the skill with which counsel has

---

[17] Chafee, Equitable Servitudes on Chattels, 41 Harv. L. Rev. 945, 983.

manipulated the concepts of 'sale' and 'agency' but on the significance of the business practices in terms of restraint of trade."

The impact of today's decision on Schwinn may be slight, because over 75% of its distribution is done through the Schwinn Plan, which the Court upholds. Perhaps Schwinn can rearrange the legal terminology of its other distributional arrangements to avoid "the ancient rule against restraints on alienation" which the Court adopts. Perhaps other manufacturers who use sales as a means of distribution in a franchise or analogous marketing system can do likewise. If they can, the Court has created considerable business for legal draftsmen. If they cannot, vertical integration and the elimination of small independent competitors are likely to follow. Meanwhile, the Court has, *sua sponte,* created a bluntly indiscriminate and destructive weapon which can be used to dismantle a vast variety of distributional systems—competitive and anticompetitive, reasonable and unreasonable.

In view of the commendably careful and realistic approach the Court has taken in analyzing the basic structure of Schwinn's marketing program, it is particularly disappointing to see the Court balk at the label "sale," and turn from reasoned response to a wooden and irrelevant formula.