**NATIONAL DAIRY PRODUCTS CORPORATION and Scooper Dooper, Inc., Plaintiffs,**

v.

**MILK DRIVERS AND DAIRY EMPLOYEES UNION LOCAL 680 et al., Defendants.**

**No. 69 Civ. 1096.**

United States District Court
S. D. New York.

Feb. 4, 1970.

Sullivan & Cromwell, New York City, for plaintiffs; David W. Peck, Michael M. Maney, Lester L. Cooper, Jr., New York City, of counsel.

Cohen & Weiss, New York City, Parsonnet, Parsonnet & Duggan, Newark, N. J., for defendants; Samuel J. Cohen, Bruce H. Simon, Stanley M. Berman, New York City, Thomas Parsonnet, Newark, N. J., of counsel.

## OPINION

FRANKEL, District Judge.

The dispute before the court concerns the question whether a restriction in a collective labor agreement, as it has been authoritatively construed and enforced by an arbitrator, should be held illegal under the antitrust laws. Agreeing that the material facts are undisputed, both sides have moved for summary judgment. Their situation and the court's decision are as follows:

### I.

Plaintiff National Dairy Products Corporation (re-named Kraftco Corporation after it filed this lawsuit) manufactures and distributes ice cream, milk and related products through its Sealtest Food Division. Among its installations in many States, it has an ice cream manufacturing plant in Long Island City, New York. Until some time in 1968 it had another such plant in Newark, New Jersey, but that was replaced by a distribution center in Edison, New Jersey, which now distributes in Northern New Jersey some of the ice cream made in Long Island City.

The two defendant Locals of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers

of America represent the Sealtest employees in the Long Island City plant (Local 757) and the Edison distribution center (Local 680). Sealtest and other ice cream manufacturers in the "Metropolitan Area" (as hereinafter defined) have made collective labor agreements with defendant unions containing the following provision, which is the source of the present controversy:

"The Company agrees for the term of this Agreement not to remove its manufacturing operations from the area of Local 757 [Local 680] and to continue to manufacture within the area of Local 757 [Local 680], and the Company, including any affiliates or subsidiaries, agrees that it shall not establish or operate a plant for production of ice cream or frozen dessert products outside of the Local 757 [Local 680] area for sale or distribution of such products in the Metropolitan Area; however, nothing herein shall restrict a company which formerly manufactured under contract with Local 757 or 680 from resuming such manufacturing under contract with said Local for distribution in its area."

Elsewhere in the essentially identical agreements, the "Metropolitan Area" is defined as consisting of "the City of New York, the Counties of Nassau, Suffolk, Westchester and Rockland in the State of New York, and the Counties of Union, Essex, Bergen, Hudson, Passaic, Middlesex, Ocean, Somerset, Morris, Monmouth, Hunterdon, Sussex and Warren, in the State of New Jersey."

Plaintiff Scooper Dooper, Inc., through its division known as Dari Farms, distributes a variety of ice cream products, purchased by it from several manufacturers, in New Jersey, Delaware and Pennsylvania. Sealtest, through its plant in Philadelphia, is one of the Dari Farms suppliers. It is among the undisputed facts that, as the complaint alleges (par. 18), "[t]he labor contracts between Dari Farms and Sealtest, respectively, and the local Unions in the Philadelphia area do not provide for 'terms and conditions of employment equal to or better than the requirements' of the labor contracts between Sealtest and defendants."

During 1968 some of the products acquired from Sealtest's Philadelphia plant were sold by Dari Farms to stores in a chain of supermarkets at locations within the State of New Jersey but outside the Metropolitan Area as defined above. Early in 1969, Dari Farms obtained an order from the same chain to supply 12 of its stores within this Metropolitan Area. It proceeded to do so, again with products manufactured by Sealtest in Philadelphia.

Upon learning of the sales to these 12 stores, defendant unions protested to Sealtest that this violated the contractual prohibition, quoted earlier, against "production * * * outside of the * * * area for sale or distribution * * * in the Metropolitan Area * * *." Sealtest countered that the restriction applied only to sales by Sealtest itself, and that the unions' broader construction would render the agreement void for conflict with the antitrust laws. The dispute was laid before an arbitrator, who ruled in the unions' favor. He found the contractual language "abundantly clear and express of purpose," and concluded "that the Company's action of supplying ice cream products from its Philadelphia plant for delivery in the Metropolitan Area violated" the agreement. He ruled that the disputed clause disclosed "readily the parties' intent to protect the achieved labor standards by preventing the importation of ice cream products into the Metropolitan Area from other areas where lower labor standards prevail." He ordered Sealtest, inter alia, to "cease and desist forthwith from supplying products from its Philadelphia plant to Scooper Dooper, Inc. * * * for delivery into the Metropolitan Area." Rendering his award as a matter of contract interpretation, he explicitly refrained from ruling upon the Company's antitrust argument. This, he concluded,

is an issue "far more appropriate for the courts to decide."

Plaintiffs lost no time in pursuit of the course thus indicated. Promptly after the arbitrator's award, they filed the present suit seeking a "judgment declaring the contracts between the Sealtest Foods Division of National Dairy Products Corporation and the defendants illegal, null and void to the extent that they would require enforcement of the arbitration award * * * and declaring said award null and void * * *." The resulting issue of law comes to the court in an uncommonly "pure" condition. Not only are the facts undisputed, but it seems clear, and equally undisputed, that the meaning of the contract provision in question has been settled for us by the arbitrator's award. However the court might have viewed it as an independent matter, the agreement has been held authoritatively to forbid the supplying of Dari Farms from Sealtest's Philadelphia plant for sales in the Metropolitan Area. Cf. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 596, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). The sole question remaining is whether the contract, as thus construed, is illegal under the antitrust laws. For reasons which follow, the court reaches a negative answer to this question.

## II.

Plaintiffs' main contention, as they state it, is "that a *per se* violation of the antitrust laws would occur if Sealtest were to abide by the Arbitrator's decision." The basis for the argument is United States v. Arnold Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), from which plaintiffs quote as follows:

"* * * where a manufacturer *sells* products to his distributor subject to territorial restrictions upon resale, a *per se* violation of the Sher-

man Act results. And, as we have held, the same principle applies to restrictions of outlets with which the distributors may deal and to restraints upon retailers to whom the goods are sold. Under the Sherman Act, it is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it. * * *

* * * * * *

"* * * Once the manufacturer has parted with title and risk, he has parted with dominion over the product, and his effort thereafter to restrict territory or persons to whom the product may be transferred— whether by explicit agreement or by silent combination or understanding with his vendee—is a *per se* violation of § 1 of the Sherman Act." (388 U.S. at 379–382, 87 S.Ct. at 1865–1867.)

While the quoted language sounds useful for plaintiffs, there are basic differences between the problem in *Schwinn* and the one here:

(1) The most obvious distinction is in the fact that *Schwinn* was a case of conspiracy, alleged and found, to eliminate competition by allocation to distributors of exclusive territories. See 388 U.S. at 367, 371–372, 87 S.Ct. 1856; 237 F.Supp. at 324–325, 326, 333–334, 335, 341–343. Plaintiffs do not allege, but expressly disclaim, any charge of conspiracy in this case.

(2) This is not in fact a case where anybody is attempting to impose territorial restrictions of the type condemned in *Schwinn*. The defendant unions did not ask, and the arbitrator did not order, that Dari Farms be excluded from selling in the Metropolitan Area. Sealtest is required only to cease delivering products for sale in this Area from its plant in Philadelphia. The distinction is genuine, not merely formal. It is not suggested by plaintiffs that Philadelphia wage scales and working conditions are so markedly below

those in defendant Locals' jurisdiction that the difference will make it impossible for Dari Farms to compete at all if it must be supplied from the latter area for Metropolitan sales. Of course, if the suggestion were made, it might serve only to bolster the claim of trade-union legitimacy on which the unions are entitled to exemption from antitrust sanctions in any event (see III, *infra*).

■ Thus, despite the alacrity with which plaintiffs would concede antitrust liability, the proposed concession seems unwarranted. Obedience to the contract, as the arbitrator has construed it, would appear to be lawful for all concerned. Cf. Apex Hosiery Co. v. Leader, 310 U.S. 469, 507, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044 (1940).

### III.

If the conclusion just stated is wrong, there remains the claim of union exemption from the antitrust laws to which the parties have devoted most of their energies. This court finds the exemption applicable, and holds this an alternative ground for dismissal of plaintiffs' suit.

■ The sources and history of the statutory exemption, 15 U.S.C. § 17; 29 U.S.C. §§ 52, 101–115, have been reviewed and explained by the Supreme Court beyond the need for repetition here. See Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982 (1940); United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941); Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945); United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Local Union etc. Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). Undertaking to apply the governing principles of those decisions, this court has deemed it suitable to inquire "whether the * * * restriction [in issue], like wages, and unlike prices, is so intimately related to wages, hours

and working conditions that the unions' successful attempt to obtain that provision through * * * bargaining * * * falls within the protection of the national labor policy and is therefore exempt from the Sherman Act." Meat Cutters v. Jewel Tea, *supra*, 381 U.S. at 689–690, 85 S.Ct. at 1602. Here as in the quoted case, the question is answered in favor of the unions.

It is plain that the contractual limitation from which plaintiffs seek to escape is squarely within the legitimate and familiar concerns of labor unions. There is here no anti-competitive purpose of the type the Sherman Act condemns, but only a provision for "the elimination of competition based on wages among the employers in the bargaining unit, which is not the kind of restraint Congress intended the Sherman Act to proscribe." Mine Workers v. Pennington, *supra*, 381 U.S. at 664, 85 S.Ct. at 1590. The achievement and preservation of minimum standards for wages, hours and other conditions "in a given industry or market area" (*Meat Cutters, supra,* 381 U.S. at 722, 85 S.Ct. at 1621, opinion of Goldberg, J.) are among the classical objectives of organized labor. See Mine Workers v. Pennington, *supra*, 381 U.S. at 666, 85 S.Ct. 1585; Apex Hosiery Co. v. Leader, *supra*, 310 U.S. at 503–504, 60 S.Ct. 982. The concern of union members reflected in the questioned contract provision "is immediate and direct." *Meat Cutters, supra,* 381 U.S. at 691, 85 S.Ct. 1596. The evident and undisputed purpose, centered exclusively upon the preservation of hard-won labor standards, differs totally from the non-exempted situations where unions, usually in combination with employers, aim designedly to stifle or eliminate competition or competitors.

Plaintiffs suggest that the argument for the labor exemption in this case may be weakened or destroyed because the restrictive contract provision in question is actually illegal under the so-called "hot cargo" provisions of the National Labor Relations Act, 29 U.S.C.

§§ 158(b) (4) and 158(e). While it is undoubtedly true that our problem involves an effort to harmonize in some measure the federal laws regulating labor relations and those promoting competition, we doubt seriously that conduct which could comprise an "unfair labor practice" should for that reason be divested of the labor exemption from the antitrust laws. To put the point more broadly, union conduct may be patently and grossly wrongful, but none the less outside the scope of Sherman Act proscriptions. Apex Hosiery Co. v. Leader, *supra*; see also Meat Cutters v. Jewel Tea, *supra*, 381 U.S. at 707–709, 85 S.Ct. 1596 (opinion of Goldberg, J.). And this may be peculiarly true where the asserted "illegality" is in the periodically altered and sometimes abstruse field of unfair labor practices. In that field, union conduct definitely exempted from the Sherman Act by the statutes defining the exemption, may in other respects be "lawful" or not, depending upon how Congress may choose to adjust the labor-management balance from time to time. It seems clear, for example, that the Norris-LaGuardia Act was meant to overturn completely decisions which had held "secondary boycotts" by unions to be in violation of the Sherman Act. See Allen Bradley Co. v. Local Union No. 3, *supra*, 325 U.S. at 805–806, 65 S.Ct. 1533. The fact that such boycotts may now run afoul of the National Labor Relations Act, see, e. g., National Labor Relations Board v. Denver Bldg. & Const. Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); International Brotherhood of Electrical Workers, etc. v. National Labor Relations Board, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951); Local 74, United Brotherhood of Carpenters, etc. Union v. National Labor Relations Board, 341 U.S. 707, 71 S.Ct. 966, 95 L.Ed. 1309 (1951), ought not, as a matter of either logic or policy, to lead to a corresponding change in the scope of the antitrust exemption.*

■ There is a simple answer, however, to the specific argument of plaintiffs in this case. Having examined the cited statutes and authorities, this court agrees with defendants that the contractual restriction in issue does not offend against the "hot cargo" provisions of the Labor Act. Once again, despite plaintiffs' preference for an expansive reading, we note that the contract clause is not one "whereby [the] employer ceases or refrains or agrees to cease or refrain from * * * dealing in the products of any other employer, or to cease doing business with any other person * * *." 29 U.S.C. § 158(e). While this is a very briefly stated conclusion in the area of a large and frequently recondite topic, it seems sufficient to the occasion.

The motion of plaintiffs is denied. Defendants' motion is granted. The

---

* The distinction is of more than academic interest. Problems like the boycott, involved at some times in antitrust, at other times in Labor Board cases, are frequently matters of the utmost subtlety and difficulty. See, e. g., National Woodwork Manufacturers Ass'n v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), and note the several passages therein categorizing distinctly questions of antitrust and of labor relations law. P. 631 n. 19, 87 S.Ct. 1250, also, in the dissent, pp. 652–655, 87 S.Ct. 1250. The two separate categories entail different substantive premises and objectives, sought through distinct and separate procedures. In the instant case, by way of illustration, both sides agree that the labor arbitrator was correct in leaving the antitrust question for judicial resolution. But query whether he would have owed a similar diffidence had he been asked to rule on a question of labor relations law. If the answer to that is yes, is it possibly because the National Labor Relations Board, rather than an arbitrator, should be the agency to rule, at least first, under the Labor Relations Act? Of course, the primary authority of the Board is a pertinent concern for this court too, and this suggests further reason for refusing to equate antitrust law with that administered by the Board.

parties will settle a judgment on notice declaring the contract provision, as construed by the arbitrator, valid and enforceable, and otherwise dismissing the complaint.