**POTTER'S PHOTOGRAPHIC APPLICA-TIONS CO., Inc., Plaintiff,**

v.

**The EALING CORPORATION and Popu-lar Science Publishing Co., Inc., Defendants.**

No. 67–C–398.

United States District Court E. D. New York.

Oct. 11, 1968.

Joseph Goldberg, New York City, for plaintiff.

DeBevoise, Plimpton, Lyons & Gates, New York City, for defendant The Ealing Corp.; Robert M. Buchanan, New York City, of counsel.

Parker, Duryee, Zunino, Malone & Carter, New York City, for defendant Popular Science Publishing Co., Inc.; Stephen Charnas, New York City, of counsel.

ZAVATT, Chief Judge.

Plaintiff is engaged in the importation, manufacture, sale and distribution of photographic and audio visual equipment, film and supplies, and sells the same to industrial, governmental and educational users throughout the country. Defendant Ealing is engaged in the production, sale and distribution of educational films. At some unstated time, plaintiff and Ealing entered into an oral agreement pursuant to which Ealing appointed plaintiff its exclusive agent in the metropolitan New York area for the sale and distribution of its films. Ealing agreed to sell to and supply plaintiff with films for resale by plaintiff in the metropolitan New York area. Plaintiff agreed to purchase the films and to sell them in the said area, and also agreed to maintain a representative stock of Ealing-produced films in its warehouse. Ealing allegedly agreed that it would not terminate the agreement arbitrarily and that it was to continue "so long as [plaintiff] established a market for Ealing's films in the metropolitan New York area."

Plaintiff began selling Ealing films and alleges that, by the expenditure of time, effort and expense, it created a demand for Ealing films in the New York area. Defendant Popular Science was aware of the aforesaid agreement but, nonetheless, persuaded Ealing to repudiate the same, and Ealing did so by terminating the agreement by letter of October 14, 1966, effective January 17, 1967. Plaintiff also alleges that as a result of its efforts in inducing Ealing to breach its agreement with the plaintiff, Popular Science was granted the exclusive sales

and/or distribution rights in the metropolitan New York area; that the termination of plaintiff's contract and the diversion of said agreement to Popular Science was accomplished by the defendants "acting in concert with another." Finally, plaintiff alleges that:

> "In the course of the conduct of the business conducted by the defendants they have in the past, and are now in *competition with other persons in the sale and distribution of films produced by defendant EALING, except as such competition* has been substantially limited, reduced and lessened by the practices and conduct hereinabove described." (Emphasis added.)

The complaint states six distinct claims for relief:

1. against both defendants for unfair competition;

2. against Ealing for breach of contract;

3. against Popular Science for inducing the breach;

4. against both defendants for conspiring to interfere with plaintiff's property rights;

5. against Ealing for fraudulently inducing plaintiff to enter into the agreement; and

6. against both defendants for violation of the federal antitrust laws.

The defendants have brought on several motions addressed to the jurisdiction of the court and to the sufficiency of certain of these claims. Ealing has moved to dismiss the entire complaint on the grounds (1) that it is not subject to personal jurisdiction in this court; (2) that venue is improperly laid in the Eastern District of New York; (3) that the court lacks subject matter jurisdiction in that the amount in controversy does not exceed $10,000. It also (4) moves to dismiss the sixth claim for failing to state a claim under the antitrust laws; (5) the fourth claim and certain paragraphs of the first claim for failing to state claims under New York law; and (6) the fifth claim, for failing to comply with Rule 9(b) of the

Federal Rules of Civil Procedure and also for failing to state a claim under New York law. Popular Science has moved (7) to dismiss the first, third and fourth claims on the ground that the court lacks subject matter jurisdiction in that there is no diversity of citizenship with respect to these claims; (8) the fourth claim on the additional ground that it fails to state a claim under New York law; and (9) the sixth claim for failing to state a claim under the antitrust laws.

Ealing's motions to dismiss the fourth and sixth claims are granted. Popular Science's motions to dismiss the first, third, fourth and sixth claims are likewise granted. All other motions are denied.

### *Personal Jurisdiction*

■ Ealing was served with process in the Commonwealth of Massachusetts on May 24, 1967 by a Deputy United States Marshal for the District of Massachusetts. Such service is contemplated by Rule 4(e) of the Federal Rules of Civil Procedure, which provides:

> "Whenever a statute or rule of court of the state in which the district court is held provides (1) for service of a summons * * * upon a party not an inhabitant of or found within the state * * * service may * * * be made under the circumstances and in the manner prescribed in the statute or rule."

The New York Civil Practice Law and Rules (CPLR) provides for service outside the State of New York.

> "A person domiciled in the state or *subject to the jurisdiction of the courts of the state under section 301 or 302* * * * may be served with the summons *without the state*, in the same manner as service is made within the state * * *." CPLR § 313. (Emphasis added.)

Service of the summons and complaint in this case was made upon Thomas Altman, Treasurer of Ealing, and therefore was made "in the same manner" as service within New York since CPLR § 311

permits corporations to be served by delivering the summons to an officer thereof. Ealing's motion to dismiss the complaint is predicated on its belief that it is not subject to the jurisdiction of the courts in New York under either CPLR § 301 or § 302. Those statutes, to the extent they are relied upon by plaintiff, read as follows:

CPLR § 301

"A court may exercise such jurisdiction over persons, property or status as might have been exercised heretofore."

CPLR § 302

"(a) As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary * * * who in person or through an agent:

1. transacts any business within the state * * *."

A hearing was ordered by the court, to clarify questions raised by the moving and answering papers with respect to the jurisdictional question, and was held on April 16 and 17, 1968. The following facts pertinent to the issue of jurisdiction and venue were developed. Ealing, a Delaware corporation,[1] maintains its principal business office in Cambridge, Massachusetts. Its total national sales volume in 1966 was $2,978,000, of which approximately $250,000 resulted from sales to New York State customers. Sales of film loops (the subject of the contract in this case) in this State for 1966 account for approximately $60,000 of the 1966 sales to New York customers. Ealing's General Manager estimated that the 1967 sales to New York State customers would be $325,000, of which $90,000 would represent sales of film loops. Ealing does not employ any salesmen in New York, or for that matter, anywhere in the country. It relies instead upon a catalog which it makes available to the trade (including businesses in New York) either at direct cost or without cost; advertisements in national trade journals which are distributed in New York; displays at trade shows, some of which are held periodically in New York. Orders are accepted or rejected by Ealing in Cambridge; shipments are F.O.B. Cambridge, Massachusetts; the goods are billed from Cambridge; payments are mailed to Cambridge.

Ealing does, however, maintain an office in New York, at 866 United Nations Plaza, New York City. This office is not a sales office of Ealing but, rather, is used solely by Mr. Richard Winslow, an Ealing employee not directly associated with their sales effort. Winslow was engaged by Ealing in November 1966 to explore the "soft ware" side of the business. He originally spent much of his time establishing contacts with New York publishers (he had been previously employed by Doubleday) while seeking to develop with them what he called "instructional packages," which contained film loops and various printed materials. Since the end of last year, Winslow has been devoting his time to developing a program for teacher training by the use of sound films and manuals. Winslow appropriately characterized his work as "product development" and he referred to himself as an "idea man." His job requires him to confer with educators, script writers, etc., from every part of the country, approximately one fifth of whom are in New York State. Winslow spends one half of his time in New York, one quarter in Cambridge, and the balance on business trips elsewhere. Although Ealing claims that none of Winslow's efforts have as yet generated income, they are undoubtedly important to Ealing's business prospects. Research and development of new products is a virtual necessity for any busi-

1. In 1954 an Ealing Corporation was organized in New York by Mr. Paul Grindle, the President of defendant Ealing. Records indicate that this corporation has never been dissolved. But the uncontradicted testimony of Mr. Austin Grindle, defendant's General Manager and brother of Paul, indicates that all of the assets of the New York corporation have been purchased by the defendant and that since 1961 the New York corporation has not conducted any business whatsoever.

ness with an eye towards future growth, and especially so in a relatively new field with much virgin territory to explore. In fact, Ealing's General Manager admitted that part of Ealing's business is to develop friendships with educators, because such friendships eventually stimulate sales. Ealing pays the rent ($295 per month) for the New York City office although Winslow signed the original lease (which has since expired). The name "Ealing" appears on the door to the office beneath Winslow's name with the same size lettering, but only Winslow's name appears on the building directory. The Manhattan telephone directory lists Ealing with the same number as that for Winslow. A joint checking account was opened in a New York bank in the names of Winslow and Ealing, to pay for the expenses of the New York office. Only Winslow is authorized to draw against it. A balance of approximately $500 is maintained in the account. Major expenses (including rent and substantial travel expenses) are paid by Ealing directly from Massachusetts. Winslow is a full time employee of Ealing at an annual salary of $23,000. A secretary is also employed in the New York office.

Several educators, some of whom are affiliated with institutions in New York City, render technical assistance to Ealing in the preparation of their film loops. They are not Ealing employees. Rather, they participate on a royalty basis in the proceeds from the sale of such films. The arrangements Ealing maintains with these advisors would permit the actual filming (conducted by one of three Ealing-employed cameramen) to take place in New York if that were the desire of the film advisor, but no specific evidence was introduced that this has ever occurred.

Ealing has also had several brief and less permanent incursions into New York State. Correspondence between plaintiff and Ealing began in November 1964 regarding a possible dealership in Ealing films. Phone conversations between Cambridge and New York stimu-lated plaintiff's apparent acceptance (by letter dated January 15, 1965) of a non-exclusive distributorship. There is some indication in the record, however, that plaintiff did not commence selling Ealing film loops until April 1965. On several occasions Ealing representatives discussed in New York State the relationship between plaintiff and Ealing. The first such meeting took place during a dinner at a New York hotel on January 29, 1965, at which the matter of film loops in the New York area was discussed for approximately three hours by Ealing's General Manager, who was in New York City for a trade show, and plaintiff's President and another employee. The second such meeting occurred in March 1965 when Ealing's Sales Manager visited plaintiff's office in Mineola, New York, for part of one day. The discussion at this meeting centered on plaintiff's desire to sell Ealing film loops to the New York City Board of Education. However, in view of the testimony that plaintiff did not commence doing business with Ealing until April 1965, it is not unlikely that at this meeting plaintiff's dealership in the entire New York area was discussed again. Ealing's Sales Manager made one or two other visits to Mineola for the same purposes. Sometime after these meetings and after June 1965, Ealing successfully obtained a New York City Board of Education "listing" of its film loops. The "contract" between Ealing and the Board of Education was actually an approval by the Board of certain Ealing film loops for use in New York City public schools. It did not assure that any such films would be ordered but, rather, that individual teachers *could* order them at an Ealing-guaranteed price. An Ealing representative made two brief trips to Board of Education offices in Brooklyn, New York, in order to learn how to accomplish the requisite paper work to gain Board approval. In January 1966, Ealing's "agreement" or listing with the Board of Education was assigned to the plaintiff, following discussions in Cambridge earlier that month. The assign-

ment, executed in Massachusetts, was accepted by plaintiff in New York. No other written contract appears to have been executed and, as the sequence of events were related to the court at the limited hearing on jurisdiction, it is unclear where, if at all, any oral agreement was entered into. That will be a matter for the trial judge, however, and is germane to the issues before this court only so far as negotiations and execution of a contract may be considered the transaction of business.

■ Ealing terminated whatever relationship it did have with plaintiff by a letter from Cambridge dated October 14, 1966 confirming an earlier telephone conversation. Allusion is made by counsel for plaintiff to negotiations between Ealing and Popular Science for a substantial loan to Ealing which, in turn, was allegedly conditioned on Ealing granting Popular Science an exclusive distributorship in the New York area. There is no testimony as to where such negotiations took place and, therefore, they can have no bearing on the question before this court.

## CPLR § 301

■ Section 301 represents a reaffirmance of preceding case law which had defined the power of New York courts to exercise in personam jurisdiction, including the classic "doing business" test applied to foreign corporations. Bryant v. Finnish Nat'l Airlines, 15 N.Y.2d 426, 260 N.Y.S.2d 625, 208 N.E.2d 439 (1965); Simonson v. International Bank, 14 N.Y.2d 281, 251 N.Y.S. 2d 433, 200 N.E.2d 427 (1964). In fact, the liberalization of the constitutional limits for the assertion of personal jurisdiction over nonresidents in International Shoe Co. v. State of Washington, Office of Unemployment Compensation and Placement, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), in which the Supreme Court held that jurisdiction may be asserted if it is fair and reasonable to do so based on minimum contacts of the defendant with the forum, has not stimulated change in the New York "doing business" test. Fremay, Inc. v. Modern Plastic Mach. Corp., 15 A.D. 2d 235, 222 N.Y.S.2d 694 (1961); Martino v. Golden Gift, Inc., 4 A.D.2d 694, 163 N.Y.S.2d 869 (1957); Irgang v. Pelton & Crane Co., 42 Misc.2d 70, 247 N.Y.S.2d 743 (1964). No precise test has been formulated to determine whether or not a foreign corporation is doing business in New York; each case must be decided on its own peculiar facts, with prior cases to serve merely as guidelines. 1 Weinstein, Korn, Miller, New York Civil Practice, ¶ 301.14. Tauza v. Susquehanna Coal Co., 220 N.Y. 259, 115 N.E. 915 (1917), the leading case in the area, held that a foreign corporation was doing business in New York when its activities in New York were not occasional, casual or isolated, but rather had a "fair measure of permanence and continuity." Other courts have characterized the degree of activity required as a "continuity of action from a permanent locale." Sterling Novelty Corp. v. Frank & Hirsch Distrib. Co., 299 N.Y. 208, 86 N.E.2d 564, 12 A.L.R.2d 1435 (1949); Irgang v. Pelton & Crane Co., supra. The business conducted in New York must not be peripheral to the main business of the corporation, but a substantial part thereof. See Chaplin v. Selznick, 293 N.Y. 529, 58 N.E.2d 719 (1944); Yeckes-Eichenbaum, Inc. v. McCarthy, 290 N.Y. 437, 49 N.E.2d 517 (1943); Holzer v. Dodge Bros., 233 N.Y. 216, 135 N.E. 268 (1922); Trans World Airlines v. Curtiss-Wright Corp., 119 N.Y.S.2d 729 (Sup.Ct.1953). Moreover, under section 301 the claim asserted against the defendant need not arise out of any of the business done in New York. Tauza v. Susquehanna Coal Co., supra. See Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). Cf. CPLR § 302. The facts of the instant case fall within these guidelines.

■■ The court recognizes that none of the following facts, standing alone, would be sufficient to subject a corporation to personal jurisdiction in New York: the telephone listing in Ealing's

name (see Miller v. Surf Properties, Inc., 4 N.Y.2d 475, 151 N.E.2d 874, 176 N.Y.S. 2d 318 (1958)); the maintenance of a New York office (see Trans World Airlines v. Curtiss-Wright Corp., supra); the display of Ealing's name on the door of that office (see Irgang v. Pelton & Crane Co., supra); the appearance of Ealing's representatives at a New York trade show, even if they were willing to take orders there (see Molina v. Hydraulic Press Mfg. Co., 10 Misc.2d 224, 167 N.Y.S.2d 280 (Sup.Ct.1956)); the maintenance of a bank account in New York (see Fremay, Inc. v. Modern Plastic Mach. Corp., supra; Weinberg v. Colonial Williamsburg, Inc., 215 F.Supp. 633 (E.D.N.Y.1963)). However, it is important not to isolate each contact of the defendant with New York and say that each such contact does not constitute the doing of business in New York. The court must look to the cumulative significance of all these activities in order to decide the question. Fremay, Inc. v. Modern Plastic Mach. Corp., supra; Hastings v. Piper Aircraft Corp., 274 App.Div. 435, 84 N.Y.S.2d 580 (1949). Although sales are not directly initiated from Ealing's New York office the work done by Winslow, with this office as his base of operations, is vital to the long-run growth of Ealing's business and is a stimulant to sales, if only indirectly. The facts of this case persuade the court that Ealing is present in New York State with such a permanence and continuity as to justify the assertion of personal jurisdiction over it. A recent decision of the New York Court of Appeals indicates that that court would sustain jurisdiction on the facts of this case. In Bryant v. Finnish Nat'l Airlines, supra, the defendant corporation was an airline with executive offices in Finland. It conducted no flights within the United States (here, goods are continuously shipped to New York for resale in New York). Finnish Airlines leased a one and one-half room office in New York City staffed by three full time and four part time employees. The office sold no tickets and made no contracts which bound the corporation. The purpose of the office was to transmit reservations from other airlines and from travel agencies to defendant's European office. The New York employees did some publicity work and a New York bank account was maintained for the payment of office expenses. In distinguishing Miller v. Surf Properties, Inc., supra, a case that seemed to call for an opposite conclusion than that reached in Bryant, the court noted that in Bryant the business done in New York was done by employees of the defendant, rather than by an independent contractor acting for others as well. The nature of the work done through the New York office in the instant case, by a full time, high salaried employee, along with the other miscellaneous indicia of New York business, requires that Ealing be held to answer plaintiff's allegations in this court. Much is made of the fact that the New York office was opened solely to accommodate Winslow; that as far as the management of Ealing is concerned, Winslow could maintain the office anywhere. The question decided by the court, however, is not *why* Ealing is or is not doing business in New York, but whether it is so doing.

### CPLR § 302

Section 302 provides plaintiff with an alternative basis for jurisdiction. The "transacts business" standard of § 302 requires less contacts than those required by the "doing business" test. Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc., 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68, cert. denied, 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965); 1 Weinstein, Korn, Miller, supra, ¶ 302.06; McLaughlin, Practice Commentary to CPLR § 302, McKinney's Consol.Laws of N.Y., Book 7B at 431. However, by the express terms of the statute, the cause of action must arise out of the business transacted within New York. The constitutional authority for this exercise of "long arm" jurisdiction is the landmark case of International Shoe Co. v. State of Washington, Office of Unemployment Compensation

and Placement, supra. Subsequently, in Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) the Supreme Court required that "there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." 357 U.S. at 253, 78 S.Ct. at 1240. Whatever the constitutional boundaries for the exercise of long arm jurisdiction may be, the New York Legislature has not extended the authority of the New York courts to its permissible limits. Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc., supra.

█ It is clear that by merely shipping goods into New York, pursuant to orders sent from New York customers, a foreign corporation does not transact any business within the state. See, e. g., Kramer v. Vogl, 17 N.Y.2d 27, 267 N.Y.S. 2d 900, 215 N.E.2d 159 (1966). In *Kramer*, no representative of the defendant ever came into New York. Similarly, the failure of a nonresident defendant to ship goods into New York, as in the instant case, pursuant to a contract made outside the State, would not per se constitute the transaction of business within New York. See McLaughlin, Practice Commentary to CPLR § 302, McKinney's Consol.Laws of N.Y., Book 7B (Supp.) at 82. In Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc., supra, the New York Court of Appeals held that a defendant may be subjected to the in personam jurisdiction of the New York courts on claims arising from a contract not executed in New York if it has otherwise purposefully availed itself of the privilege of conducting activities in New York and has thereby invoked the benefits of New York's laws. "[E]ven though the last act marking the formal execution of the contract may not have occurred in New York, the statutory test may be satisfied by a showing of other purposeful acts performed * * * in this State in relation to the contract, albeit preliminary or subsequent to its execution." 15 N.Y. 2d at 457, 261 N.Y.S.2d at 18, 209 N.E. 2d at 75.

In *Longines,* the defendant conducted substantial preliminary negotiations in New York, shipped machines to New York, and sent its employees to New York to supervise the installation and testing of the machines. The court declined to say how much less would satisfy CPLR § 302(a) (1), but it did say that, in combination, these activities "more than meet the standard."

█ The instant case falls somewhere between *Kramer* and *Longines.* While it is unclear where or when the alleged exclusive distributorship was consummated, it is clear that preliminary negotiations regarding Ealing's granting plaintiff a distributorship and also plaintiff's desire to sell Ealing films to the New York City Board of Education were conducted in New York on at least three occasions. In addition, after plaintiff's business relationship with Ealing had commenced, a representative of Ealing made at least two visits to the Board offices in Brooklyn in order to obtain assistance in expediting Board approval for Ealing films. Plaintiff's role as a Board of Education supplier was under consideration at that time, although defendant did not decide that it would permit plaintiff to service the Board until January 1966. All of these efforts in New York in relation to the agreement in the instant case were conducted by high-level officials of Ealing— the General Manager and the Sales Manager; and the result of these negotiations was the shipment of over $10,000 worth of merchandise into New York for resale to New York customers, and the assignment to plaintiff of Ealing's Board of Education "contract" albeit effected in Massachusetts. Defendant claims that the negotiations in New York are irrelevant since they were not successful, and the contract, if any, was concluded by negotiations in Cambridge, Massachusetts. While that may be where the seed ripened into fruit, there can be no doubt that it was cultivated in New York.

The Second Circuit recently interpreted New York case law to subject a foreign corporation to personal jurisdiction where it merely negotiated a contract in New York over a period of time and where the suit was for the breach of that contract. *Liquid Carriers Corp. v. American Marine Corp.*, 375 F.2d 951 (2d Cir. 1967). The court recognized that the facts positioned the case somewhere between *Kramer* and *Longines* and concluded that, in view of the fact that the defendant had sent a "high-level agent" several times into New York in order to negotiate a contract which would derive for defendant considerable economic benefit, jurisdiction should properly attach. *Liquid Carriers* is precisely on point and governs the decision in this case. In fact, a stronger case can be made for finding a transaction of business by Ealing. In *Liquid Carriers*, the contract negotiated in New York was to be performed outside of New York, while in the instant case the contract provided for shipments of film loops into this State for resale here. They were in fact shipped into New York State until Ealing terminated the agreement.

It is vigorously urged by Ealing that a case recently decided by the New York Court of Appeals (subsequent to *Liquid Carriers)* is controlling. In McKee Elec. Co. v. Rauland-Borg Corp., 20 N.Y.2d 377, 283 N.Y.S.2d 34, 229 N.E.2d 604 (1967), plaintiff and defendant, a manufacturer of electronic equipment, entered into a distributorship agreement in 1957. The trial court gave plaintiff the benefit of the doubt and found that the contract was executed in New York. The dissenting opinion in the Court of Appeals indicated that the contract was at least negotiated in New York. The contract was renewed each year for seven years in Illinois. In 1964 certain difficulties arose between the plaintiff and several consulting engineers who drew specifications for sound systems at Westchester schools, serviced by plaintiff's dealership. Defendant sent its representative to New York on several occasions to try to alleviate the friction; the representative spent what amounted to less than one full day in New York. Subsequently, defendant terminated the distributorship by a letter to the plaintiff, whereupon plaintiff brought an action, alleging, among other things, that defendant breached an oral agreement. The Court of Appeals found these contacts with New York to be so "infinitesimal" that jurisdiction could not be sustained. "Otherwise, every corporation whose officers or sales personnel happen to pass the time of day with a New York customer in New York runs the risk of being subjected to the personal jurisdiction of our courts." 20 N.Y.2d at 382, 283 N.Y.S.2d at 35, 229 N.E.2d at 607. The dissent in *McKee* argued that jurisdiction should be sustained since, unlike in *Kramer*, defendant's agent came into New York to promote the business of the defendant. Such physical presence in New York had often been the predicate for jurisdiction in the past. See 34 Brooklyn L.Rev. 148, 152–53 (1967) and cases cited therein. In addition, the dissent pointed out that the original contract was made or at least negotiated in New York. The majority opinion, however, considered that "determinative of nothing, since the original agreement lapsed at the end of one year." 20 N.Y. 2d at 382, 283 N.Y.S.2d at 38, 229 N.E. 2d at 607. The court seemed to be implying that if the suit had been based on an existing contract, executed or negotiated in New York, that might have tipped the scale in favor of jurisdiction. *McKee*, therefore, properly stands only for the proposition that an occasional foray into New York for short periods of time to intervene in the business problems of an independent distributor does not constitute the transaction of business in New York where the claim is for breach of the distributorship agreement between the defendant and his New York distributor. *McKee* in no way limits the relevance of *Liquid Carriers* to the instant case. In the instant case, defendant sent representatives to New York to seek business.

Fruitful business relationships were evidently consummated as a result of these New York activities, and the lawsuit arose out of an alleged breach of the agreement thus consummated. This is not a case of an occasional passing of the time of day with a New York customer or even a visit to New York in order to patch up a distributor's faltering relationship with his customers. Further evidence that the New York Court of Appeals would apply the rationale of *Liquid Carriers* to the facts in this case is the citation of *Liquid Carriers*, by the New York Court of Appeals, apparently with approval, only a few weeks before it handed down its decision in *McKee*. See Standard Wine & Liquor Co. v. Bombay Spirits Co., 20 N.Y.2d 13, 281 N.Y.S. 299, 228 N.E.2d 367 (1967).

On this alternative ground, therefore, Ealing's motion to dismiss the complaint must also be denied. None of the other provisions of § 302 have been considered by the court; they have not been argued by the parties and no testimony applicable to them was introduced at the hearing.

### The Antitrust Claim

The complaint is silent as to which particular statutes plaintiff is relying upon to support its antitrust claim. A supplementary memorandum of the plaintiff indicates that the claim is based on sections 1 and 2 of the Sherman Act.[2] The substance of plaintiff's contention

is that Popular Science persuaded Ealing to discontinue plaintiff as an exclusive distributor of Ealing films in the metropolitan New York area and to distribute its educational films in that area solely through Popular Science. Plaintiff alleges that, as a result, the competition in the sale and distribution of films produced by Ealing has been "substantially limited, reduced and lessened."

Both defendants rely primarily upon Ace Beer Distrib. Inc. v. Kohn, Inc., 318 F.2d 282 (6th Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963), for their contention that the substitution of one exclusive distributor for another, even though in breach of contract and even where possibly tortious under state law, is not sufficient to justify relief under the Sherman Act. Plaintiff interprets *Ace Beer* as holding only that a complaint alleging the substitution of one distributor for another, without setting forth the restraint of trade or lessening of competition as the effect thereof, is insufficient. Plaintiff's interpretation is premised on certain language in *Ace Beer:*

"That [the substitution of one exclusive distributor for another] *without the results proscribed by the Sherman Act*, is not a violation of the Act. * * The fact that a refusal to deal with a particular buyer without more, may have an adverse effect upon the buy-

2. *Section 1*
 "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *." 15 U.S.C. § 1.
 *Section 2*
 "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said

 punishments, in the discretion of the court." 15 U.S.C. § 2.
 Section 4 of the Clayton Act gives plaintiff the right to seek redress in a federal court for violations of the preceding sections of the Sherman Act:
 "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15.

er's business does not make the refusal to deal a violation of the Sherman Act. Damage alone does not constitute liability under the Act." 318 F.2d at 286–87. (Emphasis added.)

Plaintiff argues that the complaint herein does allege what the *Ace Beer* complaint failed to allege, namely that competition has been adversely affected by the aforementioned conduct of the defendants, and that the "more" alluded to in *Ace Beer* is therefore present in the instant case. It is true that the plaintiff in *Ace Beer* did not allege any restraint on competition, but only that "the defendants have * * * destroyed plaintiff as a beer distributor in interstate commerce." (Civil complaint No. 35365, filed June 3, 1959 in the Northern District of Ohio, Eastern Division). However, the addition of the allegation that the conduct of the defendants reduced or lessened the competition in the distribution of Ealing films does not save this claim from the motion to dismiss. Plaintiff makes no allegation that products equivalent to Ealing's are not readily available to others. It is not enough that the competition in the sale of Ealing's films alone has been reduced. That of course inevitably occurs whenever an exclusive distributorship is awarded. See Robinson, Providing For Orderly Marketing of Goods, 15 ABA Antitrust Sect. 282 (1959); Ace Beer Distrib. Inc. v. Kohn, Inc., supra. The substitution of one distributor for another changes the identity of a competitor in the field, but does not by itself eliminate competition. Perryton Wholesale, Inc. v. Pioneer Distrib. Co., 353 F.2d 618 (10th Cir. 1965); Ace Beer Distrib., Inc. v. Kohn, Inc., supra. If the nature of Ealing's product were such that plaintiff and other distributors could not obtain other substantially equivalent products to sell, it is possible that a Sherman Act violation might be proven. See United States v. Arnold, Schwinn & Co., 388 U.S. 365, 376, 87 S.Ct. 1856, 1864, 18 L.Ed.2d 1249 (1967); Cherokee Lab., Inc. v. Rotary Drilling Serv., Inc., 383 F.2d 97 (5th Cir. 1967),

cert. denied, 390 U.S. 904, 88 S.Ct. 816, 19 L.Ed.2d 870 (1968).

Plaintiff also claims that the "conspiracy" between Popular Science and Ealing constituted a group boycott, and hence is illegal by virtue of Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). That decision is not applicable in the circumstances of the instant case. Every grant of an exclusive distributorship will involve the cooperation and agreement of the favored distributor. "Since the immediate object of an exclusive dealership is to protect the dealer from competition in the manufacturer's product, it is likely to be the dealer who asks for it." Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S.App.D.C. 161, 243 F.2d 418, cert. denied, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957). The *Klor's* decision itself precludes its application to the case at bar. "This is not a case of a single trader refusing to deal with another, nor even of a manufacturer and a dealer agreeing to an exclusive distributorship." 359 U.S. at 212, 79 S.Ct. at 709. The *Klor's* case aims at concerted action by those on the same competitive level, and does not reach a vertical agreement between manufacturer and distributor. Richardson v. Chrysler Motors Corp., 257 F.Supp. 547 (S.D.Tex.1966); Arzee Supply Corp. v. Ruberoid Co., 222 F.Supp. 237 (D.Conn. 1963); Buxbaum, Boycotts and Restrictive Marketing Arrangements, 64 Mich. L.Rev. 671 (1966).

In the absence of any allegations of either (1) a horizontal conspiracy between competitors, (2) an effort by either defendant to establish market dominance or extend a natural monopoly of its own product, (3) an effort to drive out the products of competing film producers, or (4) other restrictive trade practices (such as price fixing), the agreement between Ealing and Popular Science to grant Popular Science an exclusive distributorship in the New York area and Ealing's decision to refuse to continue dealing with plaintiff do not violate the Sherman Act. Scanlon v.

Anheuser-Busch, Inc., 388 F.2d 918 (9th Cir.), cert. denied, 391 U.S. 916, 88 S.Ct. 1810, 20 L.Ed.2d 654 (1968); Walker Distrib. Co. v. Lucky Lager Brewing Co., 323 F.2d 1 (9th Cir. 1963); Ace Beer Distrib., Inc. v. Kohn, Inc., supra; Packard Motor Car Co. v. Webster Motor Car Co., supra; Schwing Motor Co. v. Hudson Sales Corp., 138 F.Supp. 899 (D.Md.) aff'd, 239 F.2d 176 (4th Cir. 1956), cert. denied, 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed. 2d 38 (1957). See Fulda, Individual Refusals to Deal: When Does Single Firm Conduct Become Vertical Restraint?, 30 Law and Contemp. Probs. 590 (1965). A manufacturer has the unquestionable right to refuse to deal with anyone, for reasons sufficient to itself, as long as such refusal is not in furtherance of one of the aforementioned restrictive trade practices. See, e. g., United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); United States v. Parke, Davis & Co., U.S. App.D.C., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

### The Conspiracy Claim

Paragraph 17 of the complaint is the basis for plaintiff's tort claim based on conspiracy:

"That heretofore defendants unlawfully, wrongfully and maliciously combined, conspired and joined to interfere with plaintiff's agreement with defendant EALING, and their acts, as aforesaid, constitute an unlawful, wrongful and tortious appropriation of plaintiff's property and its rights therein thereby depriving plaintiff of the sales and profits from sales derived from the distribution in the metropolitan New York area of films produced by defendant EALING."

Although plaintiff seeks to frame this allegation as a conspiracy to appropriate plaintiff's property rights, it is in reality charging Ealing with conspiring to breach the alleged agreement between itself and plaintiff. While it is generally true that a combination for the purpose of causing a breach of contract is an unlawful conspiracy, 8 N.Y.Jur. 514, it is settled law in New York that a party to a contract is not liable for conspiring to breach the same, and at most is liable for the breach itself. See, e. g., Bereswill v. Yablon, 6 N.Y.2d 301, 189 N.Y.S. 2d 661, 160 N.E.2d 531 (1959); Miller v. Vanderlip, 285 N.Y. 116, 33 N.E.2d 51 (1941); 8 N.Y.Jur. 514. The theory is that a claim against a contracting party based upon conspiracy adds nothing to the breach of contract claim, but, rather at best, merely explains the motives for the breach. It is obvious that to hold otherwise would impose double liability for the same grievance in all instances where a breach was induced by a third party. In such a case plaintiff's remedy is to bring in as a defendant that third party and seek to recover for his tortious interference with plaintiff's contract rights. See, e. g., Hornstein v. Podwitz, 254 N.Y. 443, 173 N.E. 674, 84 A.L.R. 1 (1930). This is precisely what plaintiff has attempted in this case.

The instant case does not involve the interference with a business opportunity as was presented by Keviczky v. Lorber, 290 N.Y. 297, 49 N.E.2d 146, 146 A.L.R. 1410 (1943); plaintiff already enjoyed a contractual relationship and is now aggrieved only by Ealing's breach of the same, and Popular Science's efforts in inducing the breach. See Cuker Indus., Inc. v. William L. Crow Constr. Co., 6 A.D.2d 415, 178 N.Y.S.2d 777 (1958). Cf. Moreno v. Marbil Prod., Inc., 296 F. 2d 543 (2d Cir. 1961). Nor is plaintiff's reliance on A. S. Rampell, Inc. v. Hyster Co., 3 N.Y.2d 369, 165 N.Y.S.2d 475, 144 N.E.2d 371 (1957) properly placed. That case upheld a claim of conspiracy to destroy the plaintiff's business. Although part of the conspiracy involved the cancellation of plaintiff's distributorship by one of the defendants, the essence of that claim was the agreement by the defendants to induce (by fomenting discontent) plaintiff's salesmen to leave plaintiff's employ in order to appropriate plaintiff's good will and business relationships, rather than a con-

spiracy to breach the distributorship contract between one defendant and plaintiff. That this is a proper interpretation of *Rampell*, is the reliance of the New York Court of Appeals on Duane Jones Co. v. Burke, 306 N.Y. 172, 117 N.E. 237 (1954), (a conspiracy to destroy plaintiff's business by soliciting clients and personnel to transfer their loyalties to a new agency defendants were to organize), rather than on cases such as Miller v. Vanderlip, supra.

### *The Fraud Claim*

 The essential elements of a claim based on fraudulent representations are (1) the representation of a material fact, (2) the falsity of that fact, (3) the knowledge of the defendant that the fact is not true, (4) plaintiff's deception and (5) plaintiff's injury as a result of his reliance upon the misrepresentation. Channel Master Corp. v. Aluminum Ltd. Sales, Inc., 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958). Plaintiff alleges that Ealing "agreed that it would not terminate said agreement arbitrarily; and defendant Ealing agreed that such agreement was to continue so long as [plaintiff] established a market for Ealing's films in the metropolitan New York area." It also claims that such representations by the defendant were untrue; that they were known at the time of the making thereof to be untrue; that they were nevertheless made by the defendant in order to induce plaintiff to enter the agreement; that, were it not for such representations, plaintiff would not have entered into the agreement or expended the time and money it did in furtherance of the same. Such allegations clearly state a claim under New York law. Channel Master Corp. v. Aluminum Ltd. Sales, Inc., supra.

The fact allegedly misrepresented in the instant case was defendant's intention to carry out the bargain it made with plaintiff, e. g., not to terminate the agreement arbitrarily, nor while plaintiff maintained a market for Ealing films in the New York area. Ealing contends that "where parties have entered into a contractual relationship and one of them is subsequently charged with breaching the contract, it adds nothing, as a matter of substantive law, to say that the alleged violator never intended to comply with its contract." The misrepresentation of one's present state of mind is a material fact capable of ascertainment and, as such, actionable. Channel Master Corp. v. Aluminum Ltd. Sales, Inc., supra; Restatement, Torts § 530. This rule is applicable where the person making the representation misrepresents his intention to perform an agreement. Restatement, Torts § 530, comment b. A case remarkably similar to the instant one is A. S. Rampell, Inc. v. Hyster Co., supra. "The false representation that plaintiff's distributorship would not be terminated except for cause and upon reasonable notice, if knowingly made, with the then present intention of nonperformance, and relied upon to the injury of plaintiff, is actionable." 3 N.Y. 2d at 383, 165 N.Y.S.2d at 487, 144 N.E. 2d at 380.

 Defendant also moves to dismiss the fraud claim for failing to comply with Rule 9(b) of the Federal Rules of Civil Procedure, which provides that "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Ealing's position is that plaintiff has failed to comply with 9(b) in that "it has not alleged the time, place, and precise content of the false misrepresentation [sic] and what was given up in reliance thereon." It is clear from the complaint what representations plaintiff claims were made and what plaintiff claims to have given up in reliance thereon. Rule 9(b) does not require that evidentiary facts be pleaded. 2A Moore, Federal Practice ¶ 9.03 (2d ed. 1967). While plaintiff has not pinpointed with deadly accuracy the time or place the said representations were made, in the circumstances of this case it is not fatal. Plaintiff's allegation that the representations were made during "the period prior to the making of the agreement between

plaintiff and Ealing" indicates the general time period adequately. Cf. United States v. Gill, 156 F.Supp. 955 (W.D. Pa.1957). The alleged misrepresentations are in fact the basis for the contract claim itself. It cannot be doubted therefore that the representations, if made, were made during the precontractual negotiations between the parties. For the above reasons Ealing's motion to dismiss the fifth claim is denied.

### Venue

 With the dismissal of the antitrust claim, all that remains for trial are claims over which this court may exercise jurisdiction only if there is diversity of citizenship between the parties, and therefore 28 U.S.C. § 1391(a) [3] applies. As Ealing conceded in its memorandum filed June 17, 1968, venue is therefore properly located in this court since the principal place of business of the plaintiff is in Nassau County, within this district.

### Diversity of Citizenship

Since the antitrust claim has been dismissed for insufficiency, jurisdiction may be asserted by this court only if there is diversity of citizenship.[4] 28 U.S.C. § 1332 reads:

"(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—

(1) citizens of different States

\* \* \* \* \* \*

(c) For the purposes of this section and section 1441 of this title, a corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business \* \* \*."

 It is complete diversity that is required by § 1332; that is, the plaintiff in this case must be able to sue *each* *defendant*. 1 Moore, supra, ¶ 0.60 [8.– 4]. Since plaintiff and Popular Science were both organized in New York, they are not of diverse citizenship and, therefore, Popular Science's motion to dismiss the first, third and fourth claims must be granted. However, since Popular Science is not an indispensable party, its removal from this suit does not destroy plaintiff's claims against Ealing, over which jurisdiction is properly asserted.

### Subject Matter Jurisdiction

 Diversity jurisdiction requires that the matter in controversy exceed $10,000. 28 U.S.C. § 1332. The complaint seeks well above this amount on each nonfederal claim. Ealing claims that since plaintiff's largest annual net profit from the contract was merely an approximate $1,200 in 1966, the amount in controversy cannot exceed $10,000. In an action for money damages, the amount claimed by the plaintiff is controlling unless it appears "to a legal certainty" that plaintiff is not entitled to that sum. St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938); Deutsch v. Hewes Street Realty Corp., 359 F.2d 96 (2d Cir. 1966). The court cannot say that plaintiff will surely be unable to prove, as alleged, that the contract was to continue in force as long as plaintiff established a market for Ealing films in New York and, therefore, it cannot conclude "to a legal certainty" that the amount in controversy arising out of a

3. "A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in the judicial district where all plaintiffs or all defendants reside, or in which the claim arose."

4. Plaintiff had originally sought to assert jurisdiction as to Popular Science on the

nonfederal claims on the ground that they were pendent to a substantial federal claim, namely that under the antitrust laws. See, e.g., UMW v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

**108**

breach of that agreement will not exceed
$10,000. There is no reason at this stage
to limit plaintiff's damages to one year's
profits. Nor can the court say that the
amount in controversy in the fraud and
unfair competition claims does not ex-
ceed $10,000. Moreover, plaintiff may
aggregate all claims against Ealing in
order to satisfy the amount in contro-
versy requirement; it is not necessary
that each of the claims alone satisfy the
requisite amount. 1 Moore, supra, ¶ 0.97
[1]. The motion by Ealing to dismiss
the complaint for lack of subject matter
jurisdiction is therefore denied.

### Claims To Be Tried

The court's dispositions of the several
motions leave the case in the following
posture. There are no claims cognizable
against Popular Science in this court.
The unfair competition, breach of con-
tract and fraud claims still remain to be
tried as against Ealing.

Settle an order consistent with this
opinion within fifteen (15) days from
the date hereof.