**J. N. COOK and G. Harold Cook, d/b/a Cook Brothers, Plaintiffs,**

v.

**RALSTON PURINA COMPANY, Defendant.**

**Civ. A. No. 715.**

United States District Court
M. D. Georgia,
Americus Division.

Jan. 2, 1973.

Supplemental Opinion and Order
Aug. 1, 1973.

Hall & Bloch, Macon, Ga., for plaintiffs.

Sell, Comer & Popper, Macon, Ga., for defendant.

## OPINION

ELLIOTT, Chief Judge.

Plaintiff's complaint is set out in two counts. Count One is a private antitrust action seeking damages and is brought under certain sections of the Sherman Act and the Robinson-Patman Act, it being alleged that the Defendant has violated the provisions of 15 U.S.C. § 1, which section relates to contracts,

combinations or conspiracies in restraint of trade or commerce, and of 15 U.S.C. § 2, which section relates to attempts to monopolize, and 15 U.S.C. § 13(a), which section relates to discrimination in price between different purchasers of commodities of like grade and quality, and 15 U.S.C. § 13(e), which section relates to discrimination as to services or facilities. Count Two of the complaint is a common-law damage suit for alleged breach of a warehousing contract.

The Court sitting without a jury heard the evidence in this matter and now files this opinion, which is intended as compliance with the requirements of Rule 52 of the Federal Rules of Civil Procedure.

The dispute which is the basis of this litigation grew out of a contract between the parties whereby the Plaintiffs were warehousemen and distributors of animal feeds and related products made and marketed by the Defendant.

The Plaintiffs are J. N. and G. Harold Cook, who have for a number of years carried on farming and related businesses in Sumter County, Georgia near De Soto under the partnership name Cook Brothers. They will be hereinafter referred to as "Cook Brothers" or as "the Cooks". The only activity of the Cooks which is here involved is that of warehousemen and distributors of the Defendant's products, an activity which was begun by them in 1965.

The Defendant is Ralston Purina Company, hereinafter referred to as "Purina", a seventy-eight year old Missouri corporation whose principal office is in St. Louis. It carries on a variety of business activities, including the manufacture and sale of feeds which it calls "Chows" for animal consumption. For at least the last twenty-five years it has been the country's largest manufacturer and seller of bulk and bagged animal feeds. Its products are marketed in all fifty states and in many foreign countries, the sales of the Defendant's feed division having increased from 2.8 million tons in 1950 to 4.1 million tons in 1965 to 6.4 million tons in 1970.

During the last thirty years the raising of poultry has become a major industry in the State of Georgia. Purina constructed an animal feed mill in Macon, Georgia about twenty years ago and this mill at various times has supplied feeds to the south Georgia area and to parts of Alabama and Florida. One of the principal products of the mill is chicken feed. Up until about ten years ago chicken feed was generally sold to the farmer by a local retail dealer in bags or sacks because the average chicken flock was small and the feed requirements were modest. As the size of the flocks increased bulk feeds replaced bagged feeds. It became economically wise for feed manufacturers to establish bulk supply points in order that their feeds might be readily accessible to the growers. Different manufacturers met this need in various ways. Some manufacturers built and owned their own warehouses, some rented warehouses, and some entered into contracts with independent operators. Purina generally utilized the latter method, referring to these warehouses as dealer-owned, dealer-operated warehouses, or as "Do-Do" warehouses. The Defendant's Do-Do warehouse program is designed for erection by independent businessmen of bulk storage facilities so that the Defendant's bulk feeds will be available locally to the farmer-consumer with the added advantage of local contacts and sales promotion, and the development of this program has been a major contributing factor in the expansion of the Defendant's bulk feed sales. This Do-Do program has been in effect nationwide for several years and the same form of agreement between Purina and the Do-Do warehousemen is used throughout the country. The number of warehouses covered by this standard form of agreement grew from approximately 89 in 16 states in 1965 to approximately 298 in 32 states in 1967.

Prior to 1965 the Cooks had no relationship with Purina either as customer or dealer, but during that year Marlowe

Watson and J. R. Dedman, two of Purina's agents, approached the Cooks and proposed that the Cooks build a warehouse to serve as a distribution point for Purina Chows. Purina's engineer recommended the size and specifications of the warehouse and Purina agreed to assist with the capital investments. The result was that in 1965 the Cooks erected a bulk storage facility, purchased bulk hauling trucks and made certain other substantial capital investments in connection therewith and entered into a "standard" contract with Purina which in substance provided that Purina would sell its Chows to the Cooks and give them the benefit of certain warehouse allowances, and that the Cooks in turn would sell the Chows to approved Purina dealers and the Cooks would not handle animal feeds produced by any other manufacturer.[1] The original 1965 con-

1. The contract in full was as follows:
WAREHOUSE AGREEMENT
(Bagged & Bulk Dealer Owned)
RALSTON PURINA COMPANY, a Missouri corporation, of St. Louis, Missouri, hereinafter called the Manufacturer, and J. N. and Harold Cook d/b/a COOK BROS., of De Soto, Georgia, hereinafter called the Warehouseman, hereby agree as follows:

A. THE MANUFACTURER WILL:

1. Ship to the Warehouseman a reasonable stock of bagged and bulk Purina Chows, according to the Warehouseman's order, but subject to the Manufacturer's approval, from the Manufacturer's Macon mill.

2. Sell to the Warehouseman bagged and bulk Chows f.o.b. warehouse at its regular wholesale dealer price in effect on the date of sale plus freight to the Warehouseman's station or at Manufacturer's f.o.b. mill price for truck pickup. Warehouseman shall purchase such Chows on Manufacturer's regular credit and price terms and at its then established discounts. Warehouseman shall receive a bulk allowance, as published in Manufacturer's then current "Bulk Allowance" list, for Chows sold to Warehouseman by Manufacturer in bulk in sufficient quantities, which allowance shall compensate Warehouseman for the shrinkage, loss in transit, unloading and the warehousing of bulk Chows sold to the Warehouseman by Manufacturer.

3. Pay Warehouseman a supplemental bulk warehouse allowance of One Dollar ($1.00) per ton for bulk Purina Chows sold by Warehouseman to Purina dealers approved in writing for said sales by the manager of Manufacturer's mill. Manufacturer shall credit Warehouseman's account for any supplemental bulk warehouse allowance earned. On sales of Chows to Warehouseman's retail customers, Chows fed by Warehouseman or used for Check-R-Mix, Warehouseman shall not receive the One Dollar ($1.00) per ton supplemental warehouse allowance.

4. Pay Warehouseman a supplemental bagged warehouse allowance of Two Dollars ($2.00) per ton on all sacked Chows warehoused and sold to approved Purina dealers by Warehouseman. On sales of Chows to Warehouseman's retail customers, Chows fed by Warehouseman or used for Check-R-Mix, Warehouseman shall not receive the Two Dollar ($2.00) per ton supplemental warehouse allowance.

5. Credit the Warehouseman's account for the then established value of bulk and bagged Chows, based on the mill's wholesale dealer price for said Chows then in effect, plus carload freight from Mill to Warehouseman's location, for Chows sold by the Warehouseman to Purina dealers approved in writing, for said deliveries, by the manager of Manufacturer's mill.

B. THE WAREHOUSEMAN WILL:

1. Observe the best warehousing practices, including, but not limited to, proper stock rotation and storage under absolutely dry conditions, in storing, handling, loading, and unloading all Chows shipped to the Warehouseman by the Manufacturer and be responsible for the value of the goods.

2. Keep the premises where said Chows are stored in a clean, safe, and sanitary condition.

3. Sell bagged and bulk Chows to Purina dealers approved in writing for said sales by the Manager of Manufacturer's mill. Bulk Chows will be sold to other dealers at Manufacturer's mill wholesale dealer price, plus freight to Warehouseman's location in effect on date of sale, less dealer truck bulk allowance in effect on date of sale. Sacked Chows will be sold to other dealers at Manufacturer's mill wholesale dealer prices plus freight to warehouse location in effect on the date of sale plus Two Dollars ($2.00) per ton warehouse charge.

4. Submit to Manufacturer's plant in Macon, Georgia daily memorandum billings and

tract was revised in 1967, but the operation was exactly the same under both contracts, although there was some difference in the wording of the agreement.

At all times now under discussion Purina has maintained sales districts which are geographical areas for which one of its district salesmen has sales responsibility. During the period of time here involved the counties embraced in the different sales districts have changed on several occasions, but at the time the Cooks erected their storage facility it was located in the "Marlowe Watson district" and some of the customers served by the Cooks were located in the Marlowe Watson district, but some of its customers were also located in an adjoining district known as the "Lester Bell district". The county in which the Cooks' warehouse came to be located in fact extends westward into the Lester Bell district and is surrounded on three sides by the counties of the Lester Bell district. The Cooks' warehouse was located much closer to parts of the Lester Bell district than it was to many parts of the Marlowe Watson district and the evidence shows that for the last few months before January 31, 1968 approximately 76% of the Cooks' business was in the Lester Bell district and not in the Marlowe Watson district. Purina never advised the Cooks prior to the construction of the storage facility that they would be limited in their operation to the Marlowe Watson district and Purina concedes that it was not its intention at that time to limit the Plaintiffs' distribution to the Marlowe Watson district, however, as will be later seen, it was the subsequent refusal of the agents of Purina to allow the Cooks to serve customers in the Lester Bell district which forms the major basis for the Plaintiffs' complaint.

The evidence showed that Purina's feeds and other products were shipped to the Cooks and in turn sold or used by the Cooks and paid for in the following manner: Purina shipped the bulk feed to the Cooks in carload lots and at the time of shipment invoiced the feed to the Cooks. The Cooks in turn paid Purina for the feeds either by check or credit memoranda. Purina considered the feed to belong to the Cooks at the time of shipment, as is shown by the fact that once the feed was invoiced to them it was no longer included in Purina's product inventory. Instead, Purina showed an account receivable for the feed. The Cooks considered the feed to be theirs upon receipt. As to all Purina products thus purchased by the Cooks

weight tickets, evidencing sales of bagged and/or bulk Chows by Warehouseman to approved Purina dealers from the warehouse.

5. Prepare and file all necessary license and tax returns and pay all license fees and taxes assessed or levied in respect of the Warehouseman's activities, or of the Chows and Warehouseman's possession under this Agreement.

6. Sell and deal, during the term of this Agreement, and any renewals thereof, in Purina Chows as the only commercial mixed and manufactured feeds sold or offered for sale to Warehouseman's customers; (provided, Warehouseman may sell and deal, on a retail basis only, in Check-R-Mix feeds, which are a mixture of Purina manufactured feed concentrates and locally produced grain).

C. This Agreement shall be for a term of one (1) year from the date hereof, and shall continue automatically thereafter from month to month until cancelled by either party upon thirty (30) days' written notice of its election so to cancel. Manufacturer shall have the additional right to terminate this Agreement, at any time, before the end of the initial term or any monthly renewal, upon the occurrence of either of the following:

(1) Should Warehouseman be discontinued for any reason as a Purina dealership; or

(2) Should Warehouseman fail to perform all covenants and conditions of this or any other agreement between Warehouseman and Manufacturer.

D. This agreement shall not be assigned by either party hereto.

E. Neither party hereto shall be chargeable with any amendment to this Agreement unless such amendment be written and signed by the parties and produced in evidence.

Dated this 8 day of April, 1965.

the Cooks assumed the risk of loss by shrinkage, by theft and by fire, or other casualty, and the Cooks carried insurance on the feeds for their protection against such hazards. Purina was not named as a loss payee in such coverage.

The Cooks were neither agents for nor employees of Purina and once the feed was delivered to the Cooks Purina had no obligation to allow it to be returned to them in the event it could not be sold. The Cooks paid for the feed based on the price in effect on the date of receipt by them and were credited with the price in effect on the date of delivery to a credit customer. This meant that the Cooks received the benefit of any increase in price and bore the loss on any decrease in price. Purina on the other hand neither gained nor lost by any price change.

That both parties considered these grains to have been shipped on a sale basis and not on a consignment basis is shown by comparing the method in which these shipments were handled with the method employed by Purina in shipments made by it to another warehouse in the state which was recognized as a consignment warehouse. The feeds shipped to this consignment warehouse were treated in an entirely different manner, Purina's records showing that the ownership of the entire inventory in the consignment warehouse was retained by Purina until it was delivered out of the warehouse to designated customers of Purina.

Upon shipment of a load of feed to the Cooks Purina looked directly to the Cooks for payment. The Cooks utilized some of the bulk feeds in their own farming operations. They also sold some of the feeds to customers who were on a cash basis. By far the greater portion of the feeds, however, were sold to customers who were designated by Purina as "credit approved" customers. With regard to shipments made by the Cooks to customers who were "credit approved" by Purina the following procedure was used: The Cooks obtained the signature of the farmer upon the delivery ticket and sent the delivery ticket to Purina. Purina then billed the farmer for the feed based upon the price in effect on the date of the farmer's receipt and credited the Cooks an amount based upon the price in effect on the date of the delivery.

Based on the foregoing the Court has no difficulty in concluding that the feeds referred to were sold by Purina to the Cooks at the time of shipment and that title passed to the Cooks at that time, and that title to the goods remained in the Cooks until they delivered the feeds to their cash customers or to customers who were "credit approved" by Purina, at which time title passed to these customers, these constituting sales by the Cooks to these customers.

The Cooks' operation was satisfactory and successful, as is shown by the fact that they were invoiced by Purina for feeds in an amount of $115,000.00 in 1965, $297,000.00 in 1966, $357,000.00 in 1967, and $247,000.00 in 1968. As we have previously noted, more than 75% of the feeds thus purchased by the Cooks from Purina were sold by them in the "Lester Bell district". There were no complaints from Purina or from any of Cooks' customers about Cooks' service or method of doing business, and none of Cooks' customers had expressed any intention or desire to take their business to a competitor. In fact, there were certain aspects of the Cooks' warehouse, such as the type of weight scales which they employed, which were superior to the facilities of other warehouses, and Defendant's agent, Marlowe Watson, considered the Cooks' warehouse "the best from an efficiency standpoint". It is also undisputed that the Cooks' credit remained excellent at all times. But in the latter part of 1967 Lester Bell became the sales representative for the district which later came to bear his name, and it was then that the difficulties which ensued had their inception. As has already been observed, his district was shaped somewhat oddly due to the fact that the Marlowe Watson district extended into the middle of his dis-

trict. There was already a warehouse facility in the northern part of his district, but he wanted another warehouse in the southern part of his district. He told his superiors in the Purina organization of his desire and began trying to interest businessmen in his district in putting up a warehouse. Four of his largest users of Purina products were then taking their shipments from the Cooks. It was his idea to use these four customers as the basis for justifying an application to his superiors for the establishment of a new Do-Do warehouse. Purina made a feasibility study of the proposed warehouse which was planned to be built in Dawson, Terrell County, and in this study the four Purina customers whose requirements were then coming through the Cook warehouse were shown as customers who were to be served from the new warehouse if established. The proposal was approved by Purina and the warehouse was constructed in Dawson and was operational and ready to supply Purina products in the early part of 1968. Bell approached these customers of the Cooks and told them that he would prefer that they get their feed from the Dawson station. He told at least one of them that the Dawson station "was in his territory" and that the customer "would have to start getting feed from them and stop getting feed from the Cook Brothers". The Cooks were offering the feed for the same price as was being offered in Dawson and were also offering to haul the feed for the same price as was offered by Dawson. The present dispute began when Bell told the Cooks that the four customers in his district would have to be supplied from the new warehouse and not from the Cook warehouse. At this time the Cooks were receiving both the warehouse allowance and hauling fees for the feeds delivered by them to these four customers and they felt that Bell had no right to arbitrarily deprive them of this business. They refused to stop selling and delivering feeds to these four customers, ignoring Bell's instructions. On January 31, 1968 Jerry R. Harris, then credit manager at the Macon mill, pursuant to general authority given him by Ben H. Gibbons, Purina's Area Director of Operations, wrote to the Cooks instructing them to cancel deliveries to all accounts located in Bell's district.[2] The Cooks protested by tele-

---

2. The letter was as follows:

RALSTON PURINA COMPANY

CHOW DIVISION P. O. BOX 4607 MACON, GA. 31208

January 31, 1968

Mr. Harold Cook
Cook Brothers Feed & Seed
DeSoto, Georgia 31743

Dear Harold:

Since there is now a Dealer-Owned-Dealer-Operated bulk station located in the Dawson, Georgia area we need to transfer those accounts that are in the district of Lester Bell to the Dawson bulk station.

Effective Monday, February 5, would you please cancel deliveries to those accounts located in Lester Bell's district.

This would include accounts such as C. L. Council, James C. Barbre, and John Salter as well as any others in the district.

Thank you very much for your help and co-operation.

Very sincerely,
/s/ Jerry
Jerry R. Harris
Credit Manager

phone and by letter,[3] but the instructions were not countermanded and it was necessary for the Cooks to cease making deliveries in the Lester Bell district, these customers thereafter being required to take their deliveries from Dawson.

The impact of this action on the part of Purina's representatives on the Cooks' operation is best shown by observing that in the previous year, 1967, the Cooks had received invoices from Purina for feeds in an amount of $357,000.00 and in the year following this action the amount of the invoices had dropped to $79,000.00.

The Defendant introduced evidence to show that this arbitrary action on the part of its representatives excluding Cook Brothers from making deliveries in the Lester Bell district was not in accord with Purina policy, and the Court has no doubt that this is true, and it further appears from the evidence that more than a year later on July 22, 1969 the home office of Purina required the officials at its Macon mill to get out a notice to its customers stating that, "We have received a complaint that our company is requiring that you receive Purina products through specified bulk warehouse locations" and telling the chicken producers that they had the right to make their own decisions with regard to where they would purchase Purina products, but, regardless of whether this action was in conformity with general company policy, it is clear that the Defendant's distribution system made it quite easy for this situation to arise because the contracts entered into with the warehousemen gave the mill manager the right to designate to whom credit deliveries could be made and this contract was a standard form entered into by 298 dealers in 32 states. The designation of credit approved customers was delegated by the mill manager to

---

3. One of these letters was as follows:

DeSoto, Georgia
February 1, 1968

Mr. B. H. Gibbons
Ralston Purina Company
Boulevard Center Bldg.
3947 Boulevard Center Drive
Jacksonville, Florida 32207

Re: Attached Letter: J. R. Harris
Dated 1–31–68

Dear Mr. Gibbons:

Would you please read the attached letter carefully?

Our interpretation of this letter is that our agreements and understandings with Ralston Purina Company are now of little or no value.

The decision stated in this letter completely contradicts the written agreements and oral commitments we have from representatives and officials of Ralston Purina Company. The limitations placed on our investment by this letter would have prohibited the investment had the limitations been stated when the investment decision was made.

This is to be considered as my third request for a conference with you to discuss the issues involved that have led to the decision stated in the attached letter.

May I hear from you immediately concerning this most important matter?

Sincerely,

C. H. Cook, Partner
Cook Brothers
DeSoto, Georgia 31743

CC:
Mr. Arno Tagge
Mr. Marlow Watson

the credit manager, and only a warehouseman selected by the mill to service the customer would receive a notice that a customer was credit approved. The evidence further shows that the Macon mill would periodically notify the warehousemen of the customers to whom they were authorized to make shipments, and when the application for the approval of the construction of the Dawson warehouse was submitted for Purina approval it spoke of customers which the proposed new warehouse "will" serve. Further, the evidence shows that this action on the part of Purina was not one taken simply by a lowly sales representative, but was concurred in and approved by the Macon mill credit manager, the Macon mill manager, and the Purina Area Director of Operations, which is the highest position of authority in the company in the area served by the mill. None of these Purina representatives had ever been given any training or instruction with regard to the antitrust laws.

A great portion of the evidence which the Court heard in this matter was directed to the jurisdictional interstate commerce requirements of the statutes involved.

Purina sold very substantial quantities of its feeds in south Georgia during the years 1965–1969 and we have heretofore noted the totals of the invoices representing the feeds handled by the Cooks during those years. These feeds which passed through the Cooks' warehouse were principally manufactured at Purina's Macon mill, however, some of the feed was manufactured at Davenport, Iowa, and Cincinnati, Ohio. Some of the feed which was later sold by the Dawson station to the Cooks' former customers was shipped from Nashville, Tennessee. In addition, almost all of the health products which were covered by the Cooks' contract were manufactured outside of the State of Georgia and in 1968 the Cooks sold $3,028.04 worth of these Purina health products which were manufactured outside of Georgia.

Many of the ingredients used in the manufacture of chicken feed were purchased by Purina in other states and were moved in interstate commerce to the Macon mill. The cost of ingredients purchased and manufactured outside of Georgia which were incorporated into feeds produced and shipped from the Macon mill during the years subsequent to 1965 constituted more than one-third of the cost of all ingredients so used at the Macon mill and exceeded $2,000,000.00 in cost during each year. This percentage applied to the feeds shipped to the Cooks. The sales volume of the Macon mill was between $12,000,000.00 and $15,000,000.00 annually and the volume of the out of state ingredients used to produce the feed which produced this volume was at least $6,000,000.00 annually.

The evidence did not show any deliveries of any Purina manufactured products to any point outside of Georgia by the Cooks, but Purina made deliveries of some of the products manufactured at its Macon mill and of products warehoused at its Macon mill (but manufactured in other states) to customers in at least one other state on regular occasions.

The annual freight bill for Defendant's Macon mill was stated to be over $50,000.00 and Purina used a freight rate device known as "milling in transit" on virtually all of the rail shipments of ingredients shipped into the Macon mill and all shipments from the Macon mill to the Cooks and later to the Dawson warehouse. Milling in transit rates are authorized by particular railroads pursuant to tariffs promulgated by the Interstate Commerce Commission. A shipper entitled to an in transit rate pays a through rate from the point of original shipment to the final destination, which is less than the total of the local rate from point of original shipment to an intermediate point and the local rate from the intermediate point to the point of final destination. A stoppage of the shipment at an intermediate point—such as, at the Macon mill—did not preclude the application of the through rate

where the stoppage was in accordance with the in-transit privilege. The privilege of thus stopping a commodity in transit for the purpose of subjecting it to processing and then to further transportation without losing the benefit of the through rate is termed "milling in transit". In-transit rates saved a substantial amount in freight charges for Purina. For example, under the in-transit arrangement corn could be shipped from the midwest to the Macon mill, and then from the Macon mill to DeSoto for the same freight rate that it could have been shipped from the midwest directly to DeSoto. One of Purina's witnesses explained the procedure in the following language: "It is a basis by which an ingredient is purchased, and you can stop over the car of corn, let's say, for example, for milling into feed as opposed to its original state, and then sent on to a customer at the ultimate destination with a savings or no penalty in freight."

The manufacture of chicken feed is a process of mixing various ingredients according to a pre-determined formula. At Purina's Macon mill the out of state ingredients are mixed with ingredients obtained in the State of Georgia. Generally poultry feed contains about 75% corn. The balance is made up of some protein source, such as soy bean meal or dehydrated alfalfa meal, or other sources of vitamins and trace minerals. The corn is received at the mill and is cleaned and ground. Drug pre-mixes are made by combining various quantities of vitamins, trace minerals and drugs, if they are to be used, in a separate process. Ordinarily a batch mixing process is used in which the various ingredients are drawn into a hopper-scale according to the formula. The pre-mixed materials composed of drugs, vitamins and trace minerals are also added at this point and the batch is then dropped into a mixer which agitates the components for a few minutes and the finished product is chicken feed. Only the corn is ground and in the normal procedure no liquid of any sort is added.

The only chemical change which occurs in any ingredient is the chemical change which might result from the killing of the corn kernel by grinding. Neither the ingredients nor the finished feed product is perishable by nature and may be stored without refrigeration, special care or other artificial means of preservation for reasonable lengths of time, efficient inventory control being the principal factor in rate of movement. Once the feed has been manufactured from the separate ingredients there is no way to separate it into its original components and within the industry chicken feed as compared to its ingredients has a distinctive name, character and use different from those of the separate ingredients.

For the period 1964 through 1971 of the 50 states in the Union Georgia was the second leading state in the number of chickens on farms and the second leading state in the total value of all chickens on farms. During the years 1959–1971 Georgia was the leading state in egg capacity of hatcheries and for the year 1970 Georgia was the leading state in cash receipts from commercial broilers, eggs, and all chickens and eggs. Cash receipts in Georgia for that year from these sources was $395,960,000.00, which meant that in that year Georgia produced almost 11% of the value of all chickens and eggs produced in the United States. Eighty-two per cent of the poultry which is produced in Georgia is shipped out of the state and about 70% of Georgia produced eggs are shipped out of state. John Salter, one of the producers who was supplied with feed by the Cook Brothers prior to the Cook Brothers being barred from selling in the Lester Bell district testified that in 1968, the year in which he switched from the Cook Brothers to the Dawson warehouse, he produced nine hundred thousand dozen eggs valued at approximately $270,000.00, and that between 90 and 95% of these eggs were shipped by him direct to New Jersey. The Shivers Hatchery, another of Cooks' former customers, in 1968 was shipping between 50

and 60% of its day-old chicks out of the state. Feed costs constitute the greater portion of the cost of producing chickens and eggs, this item representing about 70% of the total cost.

The Cooks used bulk feed trucks to make deliveries of the feeds sold by them, and prior to being territorially restricted they used substantial amounts of gasoline for this purpose. They purchased several thousand dollars worth of gasoline for this purpose annually and the amount of gasoline so purchased substantially declined after they were excluded from the Lester Bell district. The gasoline which they purchased was refined in Mississippi and brought into Georgia by pipeline.

Section 1 of the Sherman Act applies to contracts, combinations and conspiracies "in restraint of trade or commerce among the several states, or with foreign nations". The restraint must be upon interstate commerce. In enacting the Sherman Act the Congress exercised its full power over interstate commerce and this Act has the widest possible jurisdictional breadth.

■ Insofar as the interstate commerce requirement is concerned, an action brought under the Sherman Act may rest on one or both of two theories: (1) that the acts complained of occurred *within the flow* of interstate commerce, which is generally referred to as the "in commerce" theory; (2) that the acts complained of, while occurring wholly and entirely on the state or local levels and, therefore, in *intrastate* commerce, nevertheless substantially affected interstate commerce. Under both theories the transactions complained of must affect or have an effect on interstate commerce or the requirements of the Sherman Act are not met. Las Vegas Merchant Plumbers Association v. United States, 210 F.2d 732 (9 Cir. 1954), cert. den., 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645.

It is clear that the restraint placed upon the Cooks by Purina was a local restraint which occurred entirely within the State of Georgia. Its effect was to prevent the Cooks from supplying Purina products from their warehouse at DeSoto, Georgia to customers located in the Lester Bell district, which was also within the State of Georgia, but the fact that the restraint itself was purely local and did not cross a state line is not dispositive of the jurisdictional question, and the Cooks would be entitled to prevail on this jurisdictional point if the evidence shows either (1) that the restraint complained of occurred *within the flow of interstate commerce*, or (2) that the restraint complained of, though occurring entirely within Georgia, substantially affected interstate commerce.

■ Purina is an interstate business. The feeds which Purina sold to the Cooks and to the other competing warehouse at Dawson, which feeds were later sold by the Cooks and the other warehouse to the chicken producers, contained substantial portions of ingredients which had been brought into Purina's Macon plant in interstate commerce. The Cooks rely upon these facts and contend that the chicken feed which they were prevented from selling by Purina was "in the flow of commerce" because these ingredients had been in commerce and had been delivered to the Macon mill on an "in-transit basis" and were only temporarily stored at the Macon mill while being combined to become feed. Purina on the other hand contends that the manufacturing process at the Macon mill brought an end to the interstate movement of the ingredients and that the "flow of commerce" theory can be successfully relied upon only if the Cooks show that the chicken feeds themselves moved in interstate commerce.

All of these ingredients used by Purina to produce chicken feed at its Macon mill were owned by Purina at the time the ingredients were brought into Georgia and the Court is impressed that the procedure by which these ingredients become feed is a simple one which is accomplished by a short process taking

only a few minutes and involves no liquid additives and no substantial chemical change, the only possible chemical change involved being that which results from the "killing" of the live corn kernel when it is ground. The Court concludes that in the circumstances here presented there was a practical continuity of movement of goods in commerce and that the mixing of the ingredients in the proper proportions so as to become chicken feed did not stop the "flow of commerce" and that the restraint complained of occurred within the flow of interstate commerce. See Hardrives Co., Inc. v. East Coast Asphalt Corp., 329 F.2d 868 (5 Cir. 1964), cert. den., R. H. Wright, Inc. v. Hardrives Co., 379 U. S. 903, 85 S.Ct. 192, 13 L.Ed.2d 176, and Mandeville Island Farms, Inc. v. American Crystal Sugar Company, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1947).

Purina also contends that even if it should be determined the restraint was applied within the flow of commerce that the effect on interstate commerce was negligible and that the de minimis rule should be applied.

■ A number of decisions have made it clear that where the activity complained of does occur within the flow of interstate commerce whether or not the Plaintiff must go a step further and show the *amount* of interstate commerce which the activity affected depends on whether or not the activity was a *per se* violation of the antitrust laws. If a *per se* violation is involved and if the restraint does occur within the flow of interstate commerce, then the test is qualitative rather than quantitative and there need be no evidentiary showing of a *substantial* effect of the restraint on interstate commerce. Typical of these cases are Las Vegas Merchant Plumbers Association v. United States, supra, and United States v. Bensinger Co., 430 F. 2d 584 (8 Cir. 1970). The principle enunciated by these cases is that where the conspiracy occurs in interstate commerce, if there is a *per se* violation of the Act, the effect upon interstate commerce follows as a matter of law, because a *per se* violation of the Sherman Act presumes, as a matter of law, an effect upon interstate commerce, thus negating a showing of the amount of commerce involved. Under such circumstances, it is no defense that this amount may be small.

■ A consideration of the decision of the Supreme Court in United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), leads the Court to conclude that we are here dealing with a *per se* violation.

Schwinn, a bicycle manufacturer, had sought to forbid its wholesale distributors from selling (1) to unfranchised retailers and (2) outside their allotted territories. Purina has done the same thing; it has prevented the Cooks from (1) selling to certain named customers and (2) to any customer in the Lester Bell district.

Schwinn had two arrangements with its wholesalers: (1) some bought the bicycles outright and (2) some took the goods on consignment. Purina had the same set-up: (1) the Do-Do warehouse such as that operated by the Cooks where title passed to the warehouseman and (2) consignment warehouses where title was retained by Purina.

In *Schwinn* the Court held that the restriction placed upon the consignment wholesalers was not necessarily illegal but that the restrictions placed upon the buying wholesalers was a *per se* violation. The Court said (at p. 379, 87 S. Ct. at p. 1865):

"Under the Sherman Act, it is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it. . . . Such restraints are so obviously destructive of competition that their mere existence is enough. If the manufacturer parts with dominion over his product or transfers risk of loss to another, he may not reserve control over its destiny or the condi-

tions of its resale. . . . we are not prepared to introduce the inflexibility which a per se rule might bring if it were applied to prohibit all vertical restrictions of territory and all franchising, in the sense of designating specified distributors and retailers as the chosen instruments through which the manufacturer, retaining ownership of the goods, will distribute them to the public. . . . But to allow this freedom where the manufacturer has parted with dominion over the goods—the usual marketing situation—would violate the ancient rule against restraints on alienation and open the door to exclusivity of outlets and limitation of territory further than prudence permits."

This being a *per se* violation, it is not necessary that the evidence show a substantial effect on interstate commerce, but it is necessary that there be *some* effect. We have already noted that all of the medicines which the Cooks bought from Purina moved to them in interstate commerce and their handling of these products was affected and that their use of gasoline which moved to them in interstate commerce was also affected. The restraint placed upon the Cooks effectively prevented them from dealing with chicken and egg producers who made substantial interstate sales, the Georgia poultry industry being inextricably involved in interstate commerce. Between February 15, 1968 and October 15, 1970, three of Cooks' former customers in the Lester Bell district used a total of 5,922 tons of feed. The restraint operated on and affected the flow of commerce so as to satisfy the jurisdictional requirement. See Mandeville Island Farms, Inc. v. American Crystal Sugar Company, supra.

The Court concludes that the Defendant has violated Section 1 of the Sherman Act and that the Plaintiffs are entitled to recover damages therefor.

■ The Court finds that the allegations of the complaint charging violation of 15 U.S.C. § 13(a) are not supported by the evidence because the feeds sold by Purina to the competing Dawson warehouse were sold at the same price as was at the same time quoted to the Cooks, and while the acts of Purina deprived the Cooks of the $2.50 warehouse allowance which they otherwise would have earned, yet this cannot properly be regarded as a discrimination in price between different purchasers.

■ The Court also finds that the evidence does not support the contention that 15 U.S.C. § 13(e) has been violated. It is true that Purina improperly refused to extend credit to Cooks' customers in the Lester Bell district as a means of excluding the Cooks from that district but the Court is not aware of any case in which it has been held that the extension of credit is a "service or facility" as contemplated by the statute and the Court is unwilling to thus extend the Act.

The complaint also alleges an attempt to monopolize, a 15 U.S.C. § 2 violation. Counsel for the Plaintiffs have conceded that there is no evidence to support this claim.

The common-law action asserted in Count Two of the complaint is based upon a contention that Purina breached the warehousing *contract*, not upon any claim of tortious interference with contract rights. The evidence does not show any deviation from the terms of the basic contract and the Court concludes that the claim asserted in this Count is without merit.

The damages which will be recoverable by the Plaintiffs for the Defendant's violation of Section 1 of the Sherman Act will be determined by trial at a time to be later designated by the Court, this issue having been severed for trial.

## OPINION AND ORDER RELATIVE TO DAMAGES AND ATTORNEY'S FEES

In this private antitrust action the Court has heretofore concluded that the Defendant has violated Section 1 of the Sherman Act and that the Plaintiffs are

entitled to recover damages therefor. Since the filing of the Court's previous opinion evidence has been presented concerning damages and attorney's fees and the Court now makes the findings and reaches the conclusions hereinafter indicated with regard to these features.

It is impossible to fix the exact date on which the illegal restraint applied by the Defendant to the Plaintiffs' business began to have adverse effect. It is also impossible to fix the exact date on which its effects ceased to be felt. Representatives of the Defendant began their activities seeking to "transfer" the Plaintiffs' customers to another warehouse before the "cut-off letter" was written in January, 1968. The "cut-on letter" which the Defendant wrote, seeking to correct the mistake which had been made, was written in July, 1969, but the effects of the restraint did not end at that time. The actual customers who had been lost by virtue of the restraint could not be automatically returned to the Plaintiffs' warehouse. Nor could the Plaintiffs' good will be immediately restored. Although the Plaintiffs were again free to compete for business, they had lost the advantage which rightly was theirs which goes along with several years headstart in the business. For a considerable period of time following July, 1969 the Plaintiffs were placed in the awkward position of trying to sell and vouch for the products of a company with which they had found it necessary to litigate, and this circumstance was, of course, known in the trade. There is also ample evidence in the record to justify the conclusion that the hostility of the Defendant's representatives toward the Plaintiffs continued well beyond the writing of the letter of July, 1969. Prior to the restraint being applied the Defendant's representatives had worked closely with the Plaintiffs in promoting sales. After the Defendant had formally retreated from the restraint by writing the letter of July, 1969, it is noted that the Defendant's representatives did not even call on the Plaintiffs for a long period of time and did not cooperate with them in any way until October, 1971, when for the first time since January, 1968 a representative of the Defendant did call upon the Plaintiffs and began restoring normal relations with them, suggesting to prospective users of the Defendant's feeds that they buy feeds from the Plaintiffs. In light of the foregoing, it is the Court's view that it can be fairly said that the effect of the illegal restraint began at some time prior to January, 1968 and extended to approximately the end of the year 1971 or for a period of approximately four years.

In their briefs counsel for the parties have suggested that the Court might consider various approaches in determining the measure of damages and these suggestions have varying merit and appeal. It is not considered that any useful purpose would be served in analyzing and comparing them. In the circumstances here presented the Court has concluded that the appropriate measure of the damages which should be awarded is the amount of profit the Plaintiffs could have reasonably expected to realize from their operation during the period of the effective restraint but for the unlawful acts of the Defendant.

The Court has heretofore noted in its previous opinion that during the three years of their operation in 1965, 1966 and 1967 the Plaintiffs were well on the way toward establishing what would have been a profitable warehouse operation. In 1965 they had handled feeds of the Defendant having a dollar value of $115,000.00, in 1966, $297,000.00, and in 1967, $357,000.00. In the four months immediately prior to the cut-off letter of January 31, 1968 the Plaintiffs' volume had continued to grow. In October, 1967 Plaintiffs handled 406 tons of the Defendant's product; in November, 1967, 439 tons; in December, 1967, 494 tons; and in January, 1968, the last month before the cut-off, 621 tons. In the year following the cut-off the volume of business dropped to only $79,000.00. After March 1, 1968 there was no month in

which the operation was profitable until October, 1971, when the Defendant's representatives again established normal relations with the Plaintiffs. Based upon all of the evidence presented the Court finds that it is reasonable to conclude, and the Court does conclude, that but for the unlawful interference of the Defendant, the Plaintiffs would have realized a profit of $20,000.00 for each of the years 1968, 1969, 1970 and 1971, which they did not realize because of the Defendant's restraint.

In reaching this conclusion the Court is not unmindful of the fact that there was an apparent downturn in the egg and chicken markets during the latter part of the year 1970 which extended into the year 1971, and that this would have adversely affected the feed business, but the evidence also shows that there would in all probability have been a substantial increase in the market for feeds during the year 1969 and the major part of the year 1970, and that this increase during those two years would have at least offset the decrease which would probably have been expected in 1971, the conclusion being that these variations would average out for the whole four-year period at an annual volume to produce an average profit of $20,000.00 per year.

The Defendant contends that since the volume of the Plaintiffs' warehouse business declined during the effective period of the restraint the Cook brothers were, therefore, free to devote more of their time to their general farming and associated operations, and that the Defendant is entitled to an offset or an allowance for the value of these services which the Plaintiffs were able to perform for the benefit of their other operations, contending that such an allowance is required by the decision in Lehrman v. Gulf Oil Corporation, 464 F.2d 26 (5 Cir. 1972).

In *Lehrman* the Plaintiff was put out of business by the Defendant's illegal acts and went to work elsewhere at a fixed salary, the amount of his actual earnings in his new occupation being shown by the evidence. In this case Harold Cook, who was chiefly responsible for the management of the warehouse operation, drew no salary from the warehouse operation. He and his brother were simply partners in the entire farm operation, part of which was the feed warehouse affected by the Defendant's restraint. He continued to spend part of his time in connection with the feed operation, but less time was required because of the reduced volume, and this meant that he doubtless spent more time (or could have spent more time) in assisting his brother in their other interests. But it is impossible to determine from the evidence whether this fact resulted in any improvement in the earnings from the other sources, and since the evidence does not show that Harold Cook had any earnings in alternative employment which were in any way attributable to any increased earning capacity on his part resulting from a slow-down in the feed business, the principle enunciated in *Lehrman* does not apply.

In summary, the Court finds that the Plaintiffs are entitled to recover single damages in the amount of $80,000.00, which damages when trebled under the applicable law total $240,000.00.

 The Plaintiffs having prevailed, it is also our duty under the law to assess reasonable attorney's fees in addition to the award for damages heretofore made.

At the time of trial Plaintiffs' counsel had spent more than 1,000 hours on this case. Additional time has been spent since then on the preparation of briefs. The evidence is that, if considered on a purely hourly basis, this time should be compensated at the rate of $40.00 per hour. However, the Court does not consider this to be a situation where attorney's fees should be calculated simply on a time basis. This has been a complex and difficult case for all concerned. The lawyers involved in the litigation for both parties are highly competent and enjoy excellent professional standing

and have demonstrated a degree of skill consistent with their reputations. Plaintiffs' counsel undertook the representation of the Plaintiff on a contingent basis and have been successful in their efforts. The Court has given careful consideration to all of the circumstances and determines that the judgment to be entered in favor of the Plaintiffs should include an award of attorney's fees in the amount of $75,000.00. Stated otherwise, this means that the total judgment shall be in the amount of $315,000.00.

Plaintiffs' counsel will submit a form of judgment to be entered.